## S97P0875. DeYOUNG v. THE STATE.

(493 SE2d 157)

THOMPSON, Justice.

Andrew Grant DeYoung was convicted of the malice murders of his parents, Kathryn and Gary DeYoung, and his 14-year-old sister Sarah.[1] The jury recommended the death penalty, finding that as to each of the three counts of the indictment, the offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit: murder; the offender committed the offense of murder for the purpose of receiving money or any other

---

[1] The crimes occurred on June 14, 1993. DeYoung was indicted on September 9, 1993 and charged with three counts of malice murder. The State filed its notice of intent to seek the death penalty on September 10, 1993. Trial commenced before a jury in Cobb County on September 25, 1995, and concluded on October 13, 1995. The jury returned guilty verdicts on all three counts, and recommended a sentence of death. DeYoung was sentenced on October 13, 1995. A motion for new trial was filed on October 30, 1995, and amended on November 13, 1995 and April 22, 1996. The motion for new trial was denied on January 27, 1997. DeYoung filed a notice of appeal on February 26, 1997. His case was docketed in this Court March 19, 1997 and orally argued on June 23, 1997.

thing of monetary value; the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind of the defendant and aggravated battery of the victims prior to their deaths. OCGA § 17-10-30 (b) (2), (4), (7). The trial court sentenced DeYoung to death. Finding no error, we affirm.

During the months preceding the crime, DeYoung told his accomplice David Michael Hagerty[2] that he wanted to start a business and hoped to find investors to finance the project. He later confided in Hagerty that he had been unsuccessful in finding financial backing, but that he had another solution. He estimated his parents' estate to be worth $480,000, and, as Hagerty testified, "he felt that the only means to acquire the money was take his family's life." Subsequently, DeYoung told Hagerty that "the murders were going to have to take place," and the two met to discuss preparations.

DeYoung formulated the plan to murder his parents and two siblings by slashing their throats, and then setting fire to the house. Several days before the planned event, DeYoung drove Hagerty to the DeYoung family's church in Dunwoody. There they buried two containers — a footlocker and another box — which contained what DeYoung described to Hagerty as evidence which would incriminate him. In preparation for the murders, DeYoung and Hagerty purchased clothing and supplies, including an eleven-inch filet knife and two gasoline containers.

According to the plan, DeYoung and Hagerty traveled on foot to the DeYoung home at 2:00 a.m. on the designated day. On the way, they retrieved boots, gloves and knives from a duffle bag which DeYoung had left in the woods earlier that evening. Both men were armed with knives. They approached the DeYoung home from the rear of the property where they retrieved two containers of gasoline they had left there earlier. When they reached the house, DeYoung took a handgun from his duffle bag and tucked it into his waistband. After he cut the telephone wires, he and Hagerty entered the house. DeYoung went upstairs where his parents and sister were asleep. He instructed Hagerty to go to a downstairs bedroom where his 16-year-old brother Nathan was asleep, and to cut his throat with the filet knife.

DeYoung stabbed his mother repeatedly while she was sleeping in her bedroom upstairs; her screams awakened his father. As he struggled with his father, DeYoung's sister Sarah came to the doorway of their parents' bedroom. DeYoung slashed his father to death, and then stabbed and killed Sarah in the hallway. Hagerty heard a

---

[2] Hagerty, who was charged along with DeYoung, pled guilty to three counts of malice murder, for which he received three consecutive life sentences. He testified as a witness for the State at DeYoung's trial.

commotion upstairs, and changed his mind about killing Nathan.

Nathan testified that he heard stomping and banging noises coming from upstairs, and he heard his sister cry out and call his name. Upon finding that the phone was dead, Nathan escaped through his bedroom window and ran to a neighbor's house for assistance. Instead of setting fire to the house as they had planned, DeYoung and Hagerty searched the area for Nathan. Nathan returned with a neighbor who was armed with a gun. The neighbor noticed movement in the driveway, and observed a figure clad in black. As the neighbor was about to shoot at the man, he observed that it was Andrew DeYoung, and he called out, "Andy, what did you do?" The neighbor testified that he had no doubt the man he saw was the defendant. Nathan did not see the suspect's face, but he testified that his "movements and his body size resembled Andy, my brother."

DeYoung and Hagerty fled from the house in separate directions. Both had discarded their clothing, boots, and weapons along the way. They eventually met up later that morning at Hagerty's home, where they concocted an alibi. Hagerty observed that DeYoung had injuries to his neck and forehead.

DeYoung drove back to his home at 10:30 a.m., seven hours after the murders. He told police that he had spent most of the night at Hagerty's home, and he denied any involvement in the crimes. Authorities noted that he was calm and showed no grief over the deaths of his family members. There were scratches and abrasions present on his face, neck, hands and right arm.

Hagerty was interviewed by police and gave several statements in which he admitted his participation in the crimes. He also led authorities to the clothing worn by him during the killings, and to the footlocker and box which had been concealed on the church property. These contained DeYoung's shoulder holster and ammunition pouch and a hand-drawn map depicting the route to the DeYoung home. An arrow on the map pointed to a cul-de-sac where the house was located and was accompanied by the words "Just Do It." Hagerty also led police to a gun that fit the holster recovered in the footlocker, and a Glock Model 81 military survival knife, which he identified as similar to the knife DeYoung used on the night of the crime. The victims' wounds were consistent with that knife. DeYoung and Hagerty were arrested on the same day, and charged with the three murders.

1. The evidence was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of the malice murders of his parents and sister. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. DeYoung contends that the trial court erred in excusing prospective jurors Standifer and Huff for bias against the death penalty. In order to justify disqualification under *Wainwright v. Witt*, 469

U. S. 412, 424-426 (105 SC 844, 83 LE2d 841) (1985), it must be shown that the venireperson's views would prevent or substantially impair the performance of his duties as a juror. A juror who merely expresses "qualms" about capital punishment is not subject to being struck for cause. *Jarrell v. State*, 261 Ga. 880 (1) (413 SE2d 710) (1992); *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985). In determining whether the *Witt* standard has been met, a prospective juror's voir dire must be considered in its entirety. *Crowe v. State*, 265 Ga. 582 (10) (458 SE2d 799) (1995). And a trial court's determination that a juror should be disqualified is entitled to deference. *Diaz v. State*, 262 Ga. 750 (2) (b) (425 SE2d 869) (1993).

(a) Venireperson Standifer's voir dire responses as to whether he could vote for the death penalty were often equivocal and he initially appeared to be uncertain of his position on this issue. However, after extensive questioning by the trial court, Standifer's unwillingness to impose the death penalty became more clear. Although Standifer stated he would vote for a life sentence nine times out of ten, indicating the death penalty might be a viable option, he later explained that he would vote for death only if the crime were committed against his family or himself. Standifer concluded by stating that he had always believed he could not vote to impose the death penalty and still held that view, but noted that he had never been questioned on this subject before.

This Court has recognized that many venirepersons " 'simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear." ' [Cit.]" *Ledford v. State*, 264 Ga. 60, 64 (6) (439 SE2d 917) (1994). It was, therefore, for the trial court to resolve the equivocations and conflicts in Standifer's responses. The trial court did not abuse its discretion in ruling that this venireperson should be disqualified. Id.; *Burgess v. State*, 264 Ga. 777 (9) (450 SE2d 680) (1994); *Foster v. State*, 258 Ga. 736 (1) (374 SE2d 188) (1988).

(b) Venireperson Huff stated that she had always been opposed to the death penalty and although she thought there might be a place for it in society today, she could not vote to impose it. Huff particularly expressed her aversion to death by electrocution. Huff stated that she had given the issue of punishment a great deal of thought but her opposition to the death penalty had not changed over time. Although she would try to lay these views aside and consider death as a viable punishment option, she clearly expressed her lack of confidence that she could do so. The trial court did not err in excusing Huff on the basis of her inability to vote for death. *Ledford*, supra at (6) (b).

3. DeYoung next asserts that the trial court erred by failing to excuse venirepersons Horner, Cannon, and Brown on reverse *Wither-*

*spoon*[3] grounds. While these jurors indicated a preference for a death sentence under certain circumstances, the record supports the trial court's finding that they were capable of serving as impartial jurors and would consider both evidence in mitigation and the option of a life sentence. See *Carr v. State,* 267 Ga. 547 (6) (480 SE2d 583) (1997); *Hittson v. State,* 264 Ga. 682 (6) (449 SE2d 586) (1994). We find no error.

4. DeYoung argues that prospective jurors Mitchell and Brown should have been disqualified for bias as a result of exposure to pre-trial publicity. " 'In order to disqualify a juror for cause, it must be established that the juror's opinion was so fixed and definite that it would not be changed by the evidence or the charge of the court upon the evidence.' " *Chancey v. State,* 256 Ga. 415, 425 (3) (a) (349 SE2d 717) (1986). See also *McClain v. State,* 267 Ga. 378, 380 (1) (a) (477 SE2d 814) (1996).

(a) Although Mitchell stated he believed appellant "might" be guilty based on a newspaper account he read at the time the crimes occurred, he emphasized that appellant's guilt would have to be proven to him. He never stated that he had formed an opinion as to appellant's guilt. The trial court did not abuse its discretion in finding that this juror could lay aside any bias and decide the case on the evidence and instructions of the trial court. *Diaz,* supra at (2) (b).

(b) Although Brown expressed concern he might be biased against appellant, his doubts about his own impartiality did not demand as a matter of law that he be excused for cause. *Waldrip v. State,* 267 Ga. 739 (8) (c) (482 SE2d 299) (1997). Brown stated that he had "heard one side of the story" in the Atlanta newspaper when the crimes occurred; however, he agreed that news reports were not always accurate and he could "separate testimony from reporting that occurred two years ago." Upon further questioning, it became clear Brown was unable to recall any details of the case or the motive for the crime. The trial court's conclusion that Brown had formed no fixed opinion with regard to appellant's guilt is supported by the record. That ruling is entitled to deference from this Court. *Diaz,* supra at (2). We find no manifest abuse of discretion in qualifying this juror.

5. Appellant contends that he was denied effective assistance of counsel at trial on several grounds. Under *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), "[t]o establish ineffective assistance of counsel, [appellant] must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense." *Gross v. State,* 262 Ga. 232, 233 (1) (416

---

[3] *Witherspoon v. Illinois,* 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

SE2d 284) (1992). There is a strong presumption that counsel's performance was not deficient. *Strickland,* supra; *Smith v. Francis,* 253 Ga. 782 (1) (325 SE2d 362) (1985). And a reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* supra at 690.

Appellant argues that counsel was ineffective for failing to move to disqualify venireperson Horner for cause because she had at one time worked for the district attorney and was a good friend of a secretary who was currently employed by the office. It was shown that eighteen years earlier, Horner worked as a receptionist for the district attorney's office for a period of one week, filling in for a vacationing friend who was no longer employed there. Her duties consisted of answering phones and taking messages. Horner had no contact with the district attorney or any member of the office since that time, and she stated that her experience would not affect her judgment in the case. Unlike the juror in *Beam v. State,* 260 Ga. 784 (2) (400 SE2d 327) (1991), Horner was not and never had been a full-time employee of the district attorney's office. See *Denison v. State,* 258 Ga. 690 (4) (373 SE2d 503) (1988). Therefore, counsels' failure to move to disqualify this juror was not deficient.

DeYoung's contention that his attorneys should have moved to excuse Horner based on her exposure to prejudicial pretrial publicity is similarly without merit. Although Horner read and heard about the case from newspapers and television reports when the crimes occurred, she remembered almost nothing about it and she stated that she did not know enough to form any opinion about the case. Because it was not shown that juror Horner's opinion was so fixed and definite that she would be unable to set it aside and decide the case based on the evidence, trial counsel were not deficient in failing to move to excuse her. *McClain,* supra at (1); *Garland v. State,* 263 Ga. 495 (1) (435 SE2d 431) (1993).

Next, DeYoung contends that during the guilt-innocence phase, his attorneys were ineffective when they cross-examined Hagerty about burglaries committed by DeYoung. The trial court found that this was a deliberate tactical decision, since counsel knew DeYoung would be convicted and preferred to bring out this evidence themselves, rather than allow the prosecutor to elicit the evidence during the sentencing phase where the information could, in their judgment, be more damaging. The court noted that the idea behind the strategy was to portray Hagerty as the architect of the other crimes as well as the murders. Informed strategic decisions do not amount to inadequacy under *Strickland. Stewart v. State,* 263 Ga. 843 (6) (440 SE2d 452) (1994). "The fact that appellant and his present counsel now disagree with the difficult decisions regarding trial tactics and strategy

made by trial counsel does not require a finding that appellant received representation amounting to ineffective assistance of counsel." Id. at 847.

DeYoung next argues that counsel was ineffective for eliciting testimony from the medical examiner that the absence of any wounds on the victims' faces could mean that the perpetrator knew or had strong emotional ties to the victims. Pretermitting the question of whether the representation fell below an objective standard of reasonableness, we find no prejudice as a result of this exchange, since there is no reasonable probability the outcome of the proceeding would have been different had appellant's counsel not asked the question that led to the medical examiner's response.

Finally, DeYoung complains that his trial counsel was ineffective for failing to present character evidence in mitigation from Dianne Butler, Kathy Albright and Beth Fisher. We find no error. According to the record, trial counsel extensively investigated DeYoung's background, interviewing his teachers, other students at his school, co-workers, friends and family members. DeYoung was examined by both a psychologist and a psychiatrist and the defense presented mitigation testimony from a former teacher, a former neighbor, and appellant's grandparents. Counsel elected not to offer Butler, Albright, and Fisher as mitigation witnesses since their testimony would have been cumulative.

Decisions regarding which witnesses to present are matters of trial strategy. When founded on legitimate evidentiary concerns, such decisions do not constitute ineffective assistance of counsel. *Brooks v. State*, 265 Ga. 548 (4) (458 SE2d 349) (1995). The affidavits submitted at the motion for new trial reveal that Albright and Fisher were appellant's co-workers at Burger King. The trial court noted in its order denying the motion for new trial that the affidavits of these witnesses demonstrated that DeYoung was "intelligent, a good worker, and pleasant to be around, and [had] hopes to improve his position in life," and their testimony would have been similar to that presented by the witnesses who did testify.

We conclude that none of the enumerated actions or omissions by counsel constitute ineffective assistance of counsel.

6. There is no merit to the claim that electrocution constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Wellons v. State*, 266 Ga. 77 (32) (463 SE2d 868) (1995); *McMichen v. State*, 265 Ga. 598 (27) (458 SE2d 833) (1995).

7. DeYoung challenges the issuance of four search warrants on the basis that the issuing magistrate lacked probable cause.

A search warrant will only issue upon facts "sufficient to show probable cause that a crime is being committed or has been committed." OCGA § 17-5-21 (a). The magistrate's task in determining if

probable cause exists to issue a search warrant is

> "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984). Our duty in reviewing the magistrate's decision in this case is to determine if the magistrate had a "substantial basis" for concluding that probable cause existed to issue the search warrants. *Grier v. State*, 266 Ga. 170, 172 (465 SE2d 655) (1996). A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court. *McClain*, supra at 388. We will address the challenged search warrants in turn:

a) *Search warrants 184 and 187.*

When police arrived at the crime scene in the early morning hours of June 14, 1993, they conducted a sweep of the house but did not enter one room because it was locked. The investigating officers learned from DeYoung's brother, Nathan, that this room was DeYoung's bedroom. Later that morning, the police sought search warrant #184 to authorize a search of the entire house, including DeYoung's bedroom, and a search of several vehicles parked in the driveway, including DeYoung's van. The affidavit recited that three murder victims had been found in the house, that there were copious amounts of blood and blood spatter at the scene, and that no obvious murder weapon had been found near the bodies. The affiant also informed the magistrate that DeYoung had been seen at the house on the night of the murders. The items sought were cutting instruments and bloody clothing. The magistrate issued the warrant.

The police searched the house and vehicles but could not complete the search of DeYoung's bedroom that night because of its messy, cluttered condition. The following day, the police sought a second search warrant, #187, in order to complete their search of the house and vehicles. The supporting affidavit recited the same facts as the previous affidavit but added that DeYoung had been arrested and charged with the murder of his parents and sister. The list of items sought was expanded to include writings and books depicting or planning the execution of others and weapons other than knives. The magistrate issued the warrant.

Sufficient probable cause existed to authorize the issuance of both search warrants. With regard to search warrant #184, it is clear, based on the information contained within the affidavit, that there

was a fair probability that evidence of the murders would be found in the house and vehicles parked in the driveway. *Stephens*, supra at 182. Similarly, the magistrate had a substantial basis for concluding that there was probable cause to issue search warrant #187 — because DeYoung had been charged with the murders there was a fair probability that evidence showing DeYoung planned and executed the murders would be located in the house where he lived and in his vehicle. "An officer's inference that items sought will be at the place to be searched requires no more than 'a fair presumption' to be reasonable." *McClain*, supra at 388.

b) *Search warrant 190.*

When news of the murders became public, the police received a call from Vic Adams, the manager of a self-storage warehouse, who informed them that DeYoung was leasing a storage unit at his facility. The police then sought search warrant #190 for DeYoung's storage bin. The affidavit recited that DeYoung was charged with the murders of his parents and sister, that two plastic cans filled with gasoline were found at the murder scene, and that sections of pipe, gunpowder, and shotgun shells had been recovered in earlier searches of DeYoung's house and van. In addition, the same magistrate had issued a search warrant four hours earlier for DeYoung's footlocker and was informed at that time that, according to the accomplice, DeYoung had secreted incriminating evidence away from his house. The magistrate asked the affiant to call Mr. Adams and ask when DeYoung had last been at the storage facility. Mr. Adams told the officer that DeYoung had last been at the storage unit on the "night of the crime." Mr. Adams was actually referring to a burglary of the self-storage facility that had occurred 16 days earlier, when DeYoung had come to inventory his space to determine if any property was missing. The affiant, unaware of the misunderstanding, informed the magistrate that DeYoung had been at the storage unit on the night of the murders. The magistrate issued the search warrant.

DeYoung contends that the affiant's misstatement to the magistrate invalidates the search warrant. We disagree. The affidavit was sufficient without the erroneous information supplied by Mr. Adams. Based on the affidavit alone, the magistrate had a substantial basis to conclude that there was a fair probability that evidence incriminating DeYoung might be found in his storage unit. See *Stephens*, supra at 182; *Grier*, supra at 172. Furthermore, the magistrate was already familiar with the case and knew that DeYoung had secreted incriminating evidence away from his house. We find no error in the issuance of search warrant #190.

c) *Search warrant 191.*

At approximately 10:30 on the morning of the murders, DeYoung

arrived at the murder scene driving a Ford LTD. He parked the Ford in the cul-de-sac adjoining the DeYoung driveway, perpendicular to the curb. The police took DeYoung in for questioning and eventually arrested him. The Ford LTD was impounded and the police sought a search warrant for the vehicle two days later. The affidavit recited that DeYoung had been charged with the murders and that gasoline containers, sections of pipe, gunpowder, and shotgun shells had been found at the crime scene and in DeYoung's van. The affidavit also stated that DeYoung had been driving the Ford on the day of the murders. Based on this information, it was reasonable for the magistrate to conclude that evidence relating to the crime would be found in the Ford. See id. Search warrant #191 was valid.

8. The trial court did not err in denying DeYoung's motion to suppress his custodial statements. DeYoung was initially interviewed at the police station for approximately an hour and 20 minutes. Following this interview, he was arrested and placed in a holding cell and interviewed for some 20 to 30 minutes later that day. The trial court found that appellant was advised of his rights under *Miranda* prior to both interviews; no promises, threats, or other forms of coercion were used against him; and he knowingly and voluntarily waived his rights.

DeYoung generally asserts that the officers lied to him in an attempt to elicit an incriminating statement. Even if he had shown this to be true, use of trickery to obtain a confession does not render the confession inadmissible so long as " 'the means employed are not calculated to procure an untrue statement.' " *Moore v. State*, 230 Ga. 839, 840 (1) (199 SE2d 243) (1973). And absent any evidence that the police investigative techniques were designed to induce the "slightest hope of benefit or . . . fear of injury," the resulting statements are not rendered involuntary and inadmissible under OCGA § 24-3-50. *State v. Ritter*, 268 Ga. 108 (1) (485 SE2d 492) (1997); *Lewis v. State*, 255 Ga. 681 (3) (341 SE2d 434) (1986).

A trial court's findings as to factual determinations and credibility relating to the admissibility of a defendant's statement will be upheld on appeal unless clearly erroneous. *Bright v. State*, 265 Ga. 265 (5) (b) (455 SE2d 37) (1995). The findings in this case were not clearly erroneous.

9. The trial court did not err in denying a motion to quash the indictment for failure to supply the information required under OCGA § 17-7-54. The indictment contained the elements of the offenses charged and was sufficiently definite to protect appellant against future prosecution for the same murders. *Cook v. State*, 255 Ga. 565 (10) (340 SE2d 843) (1986); *Lewis v. State*, 215 Ga. App. 486 (451 SE2d 116) (1994).

10. DeYoung's challenges to the constitutionality of the Georgia

death penalty scheme lack merit. *Wellons*, supra at (25); *McMichen*, supra at (30).

11. Death qualification of jurors in the guilt-innocence phase of a death penalty prosecution is not unconstitutional. *McMichen v. State*, supra at (28). Nor does death penalty qualification of jurors violate the right under OCGA § 15-12-40 (a) (1), to an impartial jury drawn from a representative cross-section of the community. *Catchings v. State*, 256 Ga. 241 (3) (347 SE2d 572) (1986); *Lockhart v. McCree*, 476 U. S. 162 (106 SC 1758, 90 LE2d 137) (1986).

12. DeYoung did not present sufficient evidence to support his motion to quash the indictment based on discrimination in the selection of grand jury forepersons in Cobb County. *Rower v. State*, 264 Ga. 323 (4) (443 SE2d 839) (1994); *Ingram v. State*, 253 Ga. 622 (1) (c) (323 SE2d 801) (1984).

13. DeYoung asserts that the trial court erred in refusing to suppress his statements to the medical examiner explaining the origin of scratches to his neck, as well as photographs taken of those injuries, for the reason that the medical examiner's examination was conducted without a warrant, in violation of *Miranda* and against defendant's will.

The Fifth Amendment right against self-incrimination was not implicated by photographs which are not testimonial in nature. *Rivers v. State*, 265 Ga. 694 (3) (461 SE2d 205) (1995). See *Schmerber v. California*, 384 U. S. 757 (86 SC 1826, 16 LE2d 908) (1966). Therefore, no warrant or *Miranda* warnings were required prior to taking the photographs. And any claim of coercion is contradicted by the evidence which shows that DeYoung agreed to remove his shirt and be photographed. As for the statements concerning his injuries, it was shown that DeYoung was advised of his *Miranda* rights prior to meeting with the medical examiner, and that DeYoung himself elicited the statements at trial during his cross-examination of the medical examiner. Therefore, we find no error.

14. The trial court did not err in denying appellant's challenges to the arrays of the grand and traverse jurors on the ground that the use of the voter registration lists as the source for these jury pools results in an underrepresentation of African-Americans, young adults, Hispanics, Asians and other minorities. Because the voter list does not accurately represent the racial percentages in the county population, the computer selection was adjusted so that there is zero racial disparity. We find no evidence that African-Americans were underrepresented on the grand and traverse jury pools and similar challenges have been found to lack merit. *Wellons*, supra at (29); *Sears v. State*, 262 Ga. 805 (2) (426 SE2d 553) (1993). The other groups which DeYoung claims are underrepresented have not been found to be cognizable classes for purposes of a constitutional chal-

lenge. *Wellons*, supra at (29); *Ingram*, supra at (1) (d).

15. The trial court did not err in denying DeYoung's motion to exclude evidence or argument during the sentencing phase of trial regarding his lack of remorse. *Carr*, supra at (8) (d); *McMichen*, supra at (12).

16. The evidence overwhelmingly supports the jury's findings of aggravating circumstances under OCGA § 17-10-30 (b) (2), (4), and (7), as to each count of the indictment. OCGA § 17-10-35 (c) (2).

17. We do not find that DeYoung's death sentence was imposed as the result of impermissible passion, prejudice or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The sentence of death in this case is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3).

18. The similar cases listed in the Appendix support the imposition of the death sentence in this case, in that all these cases involved deliberate, unprovoked killings.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Bennett v. State*, 262 Ga. 149 (414 SE2d 218) (1992); *Taylor v. State*, 261 Ga. 287 (404 SE2d 255) (1991); *Jarrells v. State*, 258 Ga. 833 (375 SE2d.842) (1989); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Baxter v. State*, 254 Ga. 538 (331 SE2d 561) (1985); *Moore v. State*, 254 Ga. 525 (330 SE2d 717) (1985); *Smith v. State*, 249 Ga. 228 (290 SE2d 43) (1982).

FLETCHER, Presiding Justice, concurring.

This court and other appellate courts have held that electrocution does not constitute cruel and unusual punishment in violation of the Eighth Amendment. I write to urge the General Assembly to reconsider the method of execution in Georgia.

In the late 1880s a commission appointed by the New York legislature ascertained that electrocution was the most humane and practical method of execution.[4] In the following two decades, eleven states also concluded that electrocution was less painful and more humane than death by hanging.[5] Fortunately, neither our concept of what is humane nor our concept of what is cruel and unusual punishment must remain locked in a vacuum. In this century we have witnessed rapid changes in methods of communication and transportation. Science has caused us to rethink most everything from our views on

---

[4] See *In re Kemmler*, 136 U. S. 436, 444 (10 SC 930, 34 LE 519) (1890).
[5] *Malloy v. South Carolina*, 237 U. S. 180, 185, n. 1 (35 SC 507, 59 LE 905) (1915).

ethics and morals to our concept of space. Perhaps it is also time that Georgia rethinks its method of execution.

Just last month our neighbor state of Florida recognized the need to address this issue in view of the time in which we live.[6] A bare majority of the Florida Supreme Court held "that electrocution in Florida's electric chair in its present condition" does not violate either the U. S. or Florida's constitutional prohibition of cruel and unusual punishment. Half of that majority, however, expressed concerns that electrocution may be declared unconstitutional, and urged the Florida legislature to provide an alternative method of execution. Their concern appears well-founded, as three of the court's seven justices concluded that Florida's present method of execution violates Florida's constitutional ban on cruel and unusual punishment.

The vast majority of the states have addressed the issue through legislation. Of the thirty-eight states that permit the imposition of the death penalty, only Georgia and six other states presently provide no alternative to electrocution.[7] Therefore, I urge the General Assembly to revisit the issue in light of modern knowledge and changing attitudes as reflected in other jurisdictions.[8]

I am authorized to state that Chief Justice Benham joins in this concurrence.

DECIDED NOVEMBER 24, 1997 —
RECONSIDERATION DENIED DECEMBER 19, 1997.

*Edwin J. Wilson, Sharon L. Hopkins,* for appellant.
*Thomas J. Charron, District Attorney, Debra H. Bernes, Nancy I. Jordan, Jack E. Mallard, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Wesley S. Horney, Assistant Attorney General,* for appellee.

---

[6] *Jones v. Butterworth,* No. 90,231 (Fla. Oct. 20, 1997) (available on the Internet at htttp://nersp.nerdc.ufl.edu/~lawinfo/flsupct/cases).

[7] This information comes from the Death Penalty Information Center, available on the Internet at http://www.essential.org/dpic/.

[8] See *Poyner v. Murray,* 508 U. S. 931, 933 (113 SC 2397, 124 LE2d 299) (1993) (Souter, J., commenting) (noting that *Kemmler* is not dispositive of constitutionality of electrocution in light of modern knowledge).