## S98A1250. WHITING v. THE STATE.
### (506 SE2d 846)

HINES, Justice.

A jury found Richard Brian Whiting guilty of malice murder for the fatal bludgeoning of his employer, Charles Shriner.[1] Whiting appeals from his conviction and from the denial of his motion for new trial, claiming error in the jury instructions regarding the presumption of innocence, and that his trial counsel was ineffective for failing to request certain jury charges. The contentions of error are without merit, and we affirm.

The evidence construed in favor of the verdict established that in March or April of 1993, Whiting began to work for Charles Shriner and Shriner's wife Lori as a laborer on the couple's horse farm. A few months later, Whiting moved into the Shriners' home, and in June 1993, Whiting began having an affair with Lori Shriner. Whiting became increasingly infatuated with Lori and hostile towards Shriner. Whiting told Lori and others that Shriner did not deserve her, and that he could treat her better. Whiting stated that he could be a better husband to Lori if Shriner was "out of the way." He told a friend that he would "take care of it." Whiting explained that he would not use a gun because guns could be traced, but instead he would place the body in a barrel and sink it in a river; he would dispose of the body in a river rather than a lake because a river could not be drained and without a body he would not be charged with the murder.

The affair between Lori Shriner and Whiting lasted for about six weeks and then resumed briefly during the summer and fall of 1993. During this time, Lori became pregnant, and when Whiting asked her if he was the father, she told him that he was not. Lori termi-

---

[1] Charles Shriner was killed on or about March 18, 1994. On June 16, 1994, a Douglas County grand jury indicted Whiting for the malice murder of Shriner and for Shriner's armed robbery. Whiting's trial on the malice murder charge began on August 28, 1995. It concluded with a verdict of guilty on September 14, 1995, and that day, Whiting was sentenced to life in prison for the murder. An order of nolle prosequi on the armed robbery charge was entered on September 26, 1995. Whiting's motion for new trial was filed on October 6, 1995, amended on November 19, 1997, and denied on December 16, 1997. The notice of appeal was filed on January 14, 1998, and the appeal was docketed in this Court on April 29, 1998. The case was submitted for decision without oral argument on June 22, 1998.

nated the affair with Whiting, and she then believed that Whiting, who was known to have a bad temper, was "okay" about it. However, as late as the beginning of March 1994, Whiting was telling Lori that he loved her. Lori responded that she would never leave her husband.

On March 18, 1994, when the six-months-pregnant Lori was in Ohio visiting relatives, she called home to speak with her husband, and was told by Whiting that he had not seen Shriner since the night before. Whiting claimed that he and Shriner had gone out, had a few drinks, went to a fast food restaurant, and returned home. Whiting said that he last saw Shriner walking, in sock-clad feet, towards the barn. However, it was known that Shriner did not walk around the farm, that he drove everywhere because of a physical injury. Lori insisted that Whiting notify the police that Shriner was missing.

When police arrived they noticed that Whiting's clothes were muddy and that he appeared to have been crying. That weekend, others observed that Whiting seemed nervous and disturbed, and that he would break down and cry for no apparent reason. With the aid of a chemical which detects blood not visible to the unaided eye, examiners discovered large quantities of human blood consistent with Shriner's in the family den, near the spot on the loveseat on which Shriner often slept. The loveseat and carpet had been freshly scrubbed. Blood was also detected on a banister leading to the third floor of the Shriner home, where Whiting's bedroom was located. A large trail of human blood led out the back of the house to the carport and into the back of Shriner's pickup truck, to which Whiting had obtained a key. The back half of the truck's bed had been recently cleaned. The truck had been seen backed up in the carport around midnight on the night of Shriner's disappearance. Two hours later, the truck was seen parked near the barn. In the barn, blue tarps, nylon rope and bailing wire were stored. An axe with a small speck of human blood on the handle was found in the carport.

Approximately three months after Shriner's disappearance, his body was found in a creek located near a stable which Whiting and a girl friend had frequented for almost a year. A trash bag of the same kind that Lori Shriner kept in her kitchen was wrapped around the victim's head. The entire body was wrapped in a blue tarp and tied up with bailing wire and nylon rope. Shriner's skull had been crushed by a heavy blunt object, consistent with the dull side of an axe.

1. The evidence was sufficient to enable any rational trier of fact to find Whiting guilty beyond a reasonable doubt of the malice murder of Charles Shriner. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. For Whiting to be successful with claims of ineffectiveness of trial counsel, he must demonstrate that his attorney's performance in the case was deficient and that the deficiency prejudiced his

defense. Whiting must overcome the strong presumption that his counsel's performance was within a wide range of professional conduct and that counsel's decisions resulted from the exercise of reasonable professional judgment, the reasonableness of which is viewed at the time of trial and under the circumstances of the case. *Berry v. State*, 267 Ga. 476, 479 (4) (480 SE2d 32) (1997); *Roland v. State*, 266 Ga. 545, 546 (2) (468 SE2d 378) (1996), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). This Whiting fails to do.

(a) Whiting contends that trial counsel was ineffective for failing to request a charge on "mere presence." But, Whiting's trial counsel was a criminal defense lawyer with 20 years of experience, and after considering the evidence, presented the theory that Lori Shriner had procured someone, possibly another horse farm employee, to kill her husband, and that the murder of Charles Shriner actually occurred later in the weekend following his disappearance and at a time when Whiting was no longer "in control" of the premises.[2] Counsel's informed decisions of strategy do not amount to inadequacy under *Strickland. DeYoung v. State*, 268 Ga. 780, 785 (5) (493 SE2d 157) (1997). Moreover, the idea that mere presence without more is insufficient to convict is not a defense to a criminal charge but rather a corollary to the State's requirement to prove each element of the offense charged beyond a reasonable doubt. *Muhammad v. State*, 243 Ga. 404, 406 (1) (254 SE2d 356) (1979). The trial court fully and fairly instructed the jury on the State's burden, as well as that facts and circumstances merely casting grave suspicion upon the defendant or merely raising speculation or conjecture of the defendant's guilt would not authorize conviction.

(b) Whiting also contends that trial counsel was ineffective for failing to request a charge on corpus delicti given the defense strategy of raising questions about the true identity of the body found. However, while defense counsel in closing argument did briefly comment on whether or not the body found was that of Charles Shriner, it was not the defense strategy to question identity of the corpse. After close study of the issue, defense counsel concluded that the evidence identifying Shriner was so strong that it could not be contested. Indeed, the body was found with Shriner's distinctive wedding ring; social security card; pictures of his brother's children which Shriner carried in his wallet; his cards for money transfers, long-distance calling, and membership in a horse association; a pen with the logo from his wife's parents' farm; and a newspaper clipping

---

[2] Whiting did not testify at trial; however, the defense theory is apparent from defense counsel's questioning, his opening statement and closing argument, and from counsel's testimony at the hearing on the issue of effective representation.

of his father-in-law's obituary. Counsel's election not to pursue a challenge to identity "was a matter of tactics and strategy, and whether 'wise or unwise' did not amount to ineffective assistance of counsel. [Cit.]" *Berry*, supra at 482 (4) (i).

3. Lastly, Whiting fails in his claim that the use of the word "until" and of the phrase "unless and until" in the instructions on the presumption of innocence left the jury with an inescapable sense of inevitability in reaching a verdict of guilty, thereby removing the burden of proof from the State. This language, which tracks the statute setting forth the presumption of innocence and the standard of proof for conviction, cannot be reasonably interpreted as altering the State's burden and directing the jury to find guilt. OCGA § 16-1-5; *Roberts v. State*, 267 Ga. 669, 675 (10) (a) (482 SE2d 245) (1997).

*Judgments affirmed. All the Justices concur.*

DECIDED SEPTEMBER 14, 1998.

*Jill L. Anderson, Mary Erickson,* for appellant.
*David McDade, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Frank A. Ilardi, Assistant Attorney General,* for appellee.