## A04A0369. THOM v. THE STATE.
(601 SE2d 741)

MIKELL, Judge.

Anthony Thom and his co-defendant, Wayne Boatwright, Jr., were charged with armed robbery, kidnapping with bodily injury, two counts of aggravated assault, and possession of a firearm during the commission of a crime. Boatwright, who was 15 years old when the crimes were committed, entered a plea of guilty and testified against Thom at trial. The jury convicted Thom of all charges except possession of a firearm. He was given a life sentence, plus three twenty-year sentences to run concurrently with each other but consecutively to the life sentence. After the denial of Thom's motion for a new trial, he filed the present appeal, arguing that the trial court erred in denying his motion for a mistrial and in allowing improper testimony. He further argues that he was denied the effective assistance of counsel. We affirm the conviction.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict. *Paul v. State*, 231 Ga. App. 528 (499 SE2d 914) (1998). We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). "The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted.) *Green v. State*, 249 Ga. App. 546, 548-549 (1) (547 SE2d 569) (2001).

So viewed, the record shows that on the evening of Sunday, October 14, 2001, Doug Steidle left home and drove to his employer's office in a red Infiniti G20 automobile. Thom, Boatwright, and Godfrey Plunkett, who had all been drinking alcohol and smoking marijuana, were riding in Plunkett's car when they began following Steidle. Steidle parked his car in the office parking lot and went inside. When he returned to his car, Thom and Boatwright ran toward him and shouted, "stop, mother fucker or we'll blow your head off." Both men wore masks, and Thom had a gun. They demanded money and Steidle's car keys and threatened to kill him. After Steidle provided his wallet and keys, the man who was later identified as Thom pistol-whipped him. During this assault, one of Thom's blows missed the victim and shattered the rear window of the Infiniti. The men initially dragged Steidle toward a nearby wooded area and then back toward the car. When Steidle tried to resist by holding onto a sign pole, they hit him over the head with pieces of slate that were part of the sign. Thom and Boatwright dragged Steidle back to the parking lot and ordered him to get into the trunk of the Infiniti. He refused, prompting his attackers to beat him with metal chairs that

had been inside the trunk. When Steidle finally agreed, Thom shot him twice in the thigh before forcing him into the trunk. They departed in the Infiniti. Steidle managed to open the trunk from the inside, and he rolled out of the vehicle. The men stopped the car and forced Steidle back into the trunk. When they began driving, Steidle again popped the trunk and rolled out. This time, Boatwright got out of the car and threatened that Thom would kill Steidle. When he refused to get back in the trunk, the men drove off. Steidle rolled to the side of the road, where he waited for several minutes before rolling across the street to an apartment complex. He knocked on a door and requested that the occupants of the apartment call 911. Steidle suffered head injuries requiring approximately 40 staples and 20 stitches, and his leg was shattered by the two gunshots.

Thom and Boatwright proceeded to an apartment complex where Thom's aunt lived. They burned their clothes in the nearby woods and went through Steidle's wallet. Next, they drove the Infiniti to a Stone Mountain apartment complex where they both resided. There, they encountered Plunkett, who asked what had happened. Thom responded that they "got him." Thom and Boatwright retrieved some clothes, bought drugs, and drove the Infiniti to a Marietta trailer park where Boatwright's girlfriend, Dottie Price, lived with her family. While driving, they placed several calls to Price using Steidle's cellular telephone.

When they arrived at Price's home, she and members of her family noticed that the rear window of the Infiniti had been shattered. Thom told Price's mother that the car belonged to his father. He and Boatwright told Price that they had borrowed the car and had come to Marietta because they were in trouble and could not return to Stone Mountain. Price's younger brother, Franklin Price, testified that when he woke up on the night in question, Thom and Boatwright were at his family's trailer home. He also noticed the red car with a shattered rear window. Price's mother allowed Thom and Boatwright to stay in their trailer for approximately one week.

Jennifer Buckley, an acquaintance of Thom, visited him at the trailer park. Thom told her that the red Infiniti belonged to his uncle; however, she testified that she became suspicious when he later changed his story. At Thom's request, Buckley drove the red Infiniti to Stone Mountain while Thom and Boatwright followed closely in her car in an effort to hide from other drivers the fact that the rear window was missing. Buckley found a receipt with Steidle's name on it in the glove compartment, broken glass in the backseat, and two cell phones under the seat.

Kristin Reed, an acquaintance of Thom and Boatwright, testified that she saw the two men in the Infiniti near their apartment complex in Stone Mountain and later at the Marietta trailer park. Boatwright

told her that the car was his and explained that the rear window was missing because someone shot at him.

On October 20, 2001, Officer Louis Defense of the Smyrna Police Department saw the red Infiniti strike a stop sign that was within approximately five miles of the trailer park where Price lived. When the officer activated his lights and siren, the car sped up and ran several stop signs before stopping after it struck a tree. The two occupants escaped on foot.

Telephone records from Steidle's cell phone led police to the Price family, Reed, and Buckley. Statements by Buckley, Reed, and Price's mother implicated Thom and Boatwright in the crimes. Boatwright went to Florida with his mother but returned to Georgia to turn himself in to the authorities. He gave a statement incriminating himself and Thom. Police arrested Thom on May 18, 2002.

1. First, Thom argues that the trial court erred in refusing to grant a mistrial after a witness testified regarding irrelevant and prejudicial matters. Finding no abuse of discretion, we affirm.

When Price was asked if she had ever seen a gun in the red Infiniti, she responded: "Only the guns that they stole from the men in the trailer park." The defense immediately objected and, after the jury had left the courtroom, moved for a mistrial. The prosecutor responded that he had not intended to elicit that testimony. He confirmed that Thom and Boatwright had been implicated in a home invasion in the trailer park; however, that incident was not related to the charged offenses, and the state did not plan to introduce the evidence at that trial. The trial court denied the motion for a mistrial but agreed to give a curative instruction to the jury. After hearing the court's proposed instruction, defense counsel asked that the court not repeat the objected-to testimony. The court instructed the jury as follows:

> Ladies and gentlemen, I'm going to ask you to do something that many people believe that intelligent adults cannot do but I'm going to assume that you can do that, and that is I'm going to direct you to totally and completely disregard the last statement by this witness. Can you do that?

None of the jurors responded in the negative, and the proceedings continued.

"A trial court's discretion in granting or refusing to grant a mistrial should not be disturbed unless a mistrial is essential to the preservation of the right to a fair trial." (Citation and punctuation omitted.) *Hamilton v. State*, 274 Ga. 582, 586 (7) (555 SE2d 701) (2001). In determining whether an abuse of discretion has occurred, this Court will look at the relevant circumstances, including "the

nature of the statement, the other evidence in the case, and the action taken by the court and counsel concerning the impropriety." *Baker v. State*, 259 Ga. App. 433, 434-435 (2) (577 SE2d 282) (2003), citing *Nelson v. State*, 204 Ga. App. 409, 410 (2) (419 SE2d 502) (1992).

Bearing these principles in mind, we cannot conclude that the trial court erred. The curative instruction given and the overwhelming evidence of Thom's guilt support the court's exercise of discretion to deny the motion for a mistrial.

2. Next, Thom argues that the trial court erred in allowing the state to introduce evidence of prior consistent statements made by Plunkett and Boatwright. He contends that the state improperly bolstered the testimony of those witnesses by presenting inadmissible hearsay evidence. We disagree.

In *Woodard v. State*, 269 Ga. 317 (496 SE2d 896) (1998), our Supreme Court clarified the rule pronounced in *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982), and *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985), holding that evidence of a witness's prior consistent statement is admissible only where: "(1) the veracity of a witness's trial testimony has been placed in issue at trial; (2) the witness is present at trial; and (3) the witness is available for cross-examination." (Footnote omitted.) *Woodard*, supra at 319-320 (2). The Court went on to hold that "a witness's veracity is placed in issue so as to permit the introduction of a prior consistent statement only if the affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross examination." (Footnote omitted.) Id. Accord *Baugh v. State*, 276 Ga. 736, 738 (2) (585 SE2d 616) (2003). The Court explained:

> Thus, to rebut a charge that a witness is motivated or has been influenced to testify falsely or that his testimony is a recent fabrication, evidence is admissible that he told the same story *before* the motive or influence came into existence or *before* the time of the alleged recent fabrication. In those circumstances, the prior consistent statement is defined as not hearsay and thus is admitted into evidence.

(Punctuation and footnote omitted; emphasis in original.) *Woodard*, supra at 320 (2).

(a) First, Thom argues that Plunkett's testimony was improperly bolstered by evidence of out-of-court statements he made to his brother, Jeffrey Plunkett, and to Jason Hammer, an investigator with the district attorney's office. On direct examination, Plunkett testified about the events of the date in question, including that Thom and Boatwright told him to follow the victim's car, that he heard a gunshot

in the parking lot, that Thom and Boatwright came to his apartment driving Steidle's car, and that Thom had blood on his shirt and said that they "got him."

On cross-examination, Plunkett admitted that he initially lied to the prosecutor and an investigator about his involvement in the attack. Next, defense counsel questioned Plunkett about the possible sentences for the offenses charged against Thom and the law regarding parties to a crime. Counsel elicited testimony concerning the immunity deal Plunkett was given and asked him questions including the following: "No matter what you say today you will not be going to prison?" and "So long as you stick with that story and help them prosecute Mr. Thom[,] you're covered, you're not going to jail; is that right?"

When called by the state, Jeffrey Plunkett testified that his brother told him that there had been a shooting and that he was present when Plunkett spoke to the prosecutor. Investigator Hammer testified about Plunkett's statement incriminating Thom and Boatwright and the grant of immunity to Plunkett.

Thom argues that the prior consistent statements made by Plunkett to his brother and to Investigator Hammer were inadmissible because the defense had not challenged the veracity of his trial testimony. Our review of the trial transcript, including the questions quoted above, leads us to conclude otherwise. In fact, at the hearing on Thom's motion for a new trial, defense counsel testified that their strategy was to attack Plunkett and Boatwright's credibility. Because Plunkett's veracity had been placed in issue, the trial court did not err in admitting the prior consistent statements.

(b) Next, Thom argues that the trial court erred in permitting Boatwright's father and Investigator Hammer to bolster Boatwright's testimony. Thom does not explain the basis for his contention that this evidence was admitted in error; however, our review of the record reveals that defense counsel repeatedly accused Boatwright of lying on the stand. In fact, the court instructed counsel to refrain from calling Boatwright a liar. Counsel continued to aggressively challenge Boatwright's credibility by forcing him to admit that he lied in his original statement to the police. Additionally, counsel elicited testimony concerning his plea bargain and the fact that he would be given a reduced sentence in exchange for his testimony. Accordingly, because the veracity of Boatwright's testimony was called into question, his prior consistent statements were admissible under the applicable case law. See *Baugh*, supra; *Woodard*, supra.

3. Finally, Thom contends that he was denied the effective assistance of counsel because his lawyer did not file a notice of intent to present alibi evidence and failed to call Thom's aunt, Denise Brutus, as an alibi witness.

The proper standard to be employed in determining enumerations concerning ineffective assistance of counsel . . . is the two-pronged test announced in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). First, appellant must show that counsel's performance was deficient; second, he is required to show that he was prejudiced by counsel's deficient performance. There is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance, and that any challenged action by trial counsel might be considered sound trial strategy. As to the second prong, the question is whether there exists a reasonable probability that, but for his counsel's errors, the jury would have had a reasonable doubt regarding appellant's guilt, that is, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Further, a trial court's finding that a defendant has been afforded effective assistance of counsel must be upheld unless that finding is clearly erroneous.

(Citation omitted.) *Hall v. State*, 243 Ga. App. 804, 805 (534 SE2d 196) (2000). Bearing these principles in mind, we cannot conclude that the trial court's judgment was clearly erroneous.

At the hearing on Thom's motion for a new trial, his trial counsel testified that she investigated a number of potential alibi witnesses suggested by Thom; however, she determined for various reasons that it would not be beneficial to the defense to call them. Counsel further testified that she and her investigator interviewed Brutus, and that she made a tactical decision not to call Brutus as a witness because her testimony regarding the time Thom was at her home was not consistent with the telephone records provided by the state. Additionally, counsel determined that Brutus would be easily impeached.[1]

It is well settled that "[d]ecisions regarding which witnesses to present are matters of trial strategy. When founded on legitimate evidentiary concerns, such decisions do not constitute ineffective assistance of counsel." *DeYoung v. State*, 268 Ga. 780, 786 (5) (493 SE2d 157) (1997), citing *Brooks v. State*, 265 Ga. 548, 549-550 (4) (458 SE2d 349) (1995). Accordingly, Thom has failed to demonstrate

---

[1] In fact, Brutus was impeached at the motion hearing. She testified that Thom was staying with her on the night of the attack on Steidle. She admitted on cross-examination, however, that she was unable to pinpoint which nights Thom actually spent at her home. Further, Brutus testified that she did not attend the trial when Buckley, Reed, Price, and Price's mother testified about Thom spending a week at the Marietta trailer park, and she was unable to say whether their testimony was inaccurate.

deficient performance; thus we need not address the prejudice element of the *Strickland* test.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED JUNE 30, 2004.

*Derek M. Wright*, for appellant.

*Jeffrey H. Brickman, District Attorney, Robert M. Coker, Assistant District Attorney*, for appellee.