**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 7, 2014**

# In the Court of Appeals of Georgia

A14A0536. THOMPSON v. THE STATE.                                    DO-018

DOYLE, Presiding Judge.

Donald Thompson was convicted of two counts of voluntary manslaughter[1] as a lesser included charge of murder and felony murder, one count of pointing a firearm at another[2] as a lesser included charge of aggravated assault, four counts of reckless conduct,[3] and one count of cruelty to children in the third degree.[4] The trial court denied Thompson's motion for new trial, and he appeals, arguing that (1) the trial court erred by failing to grant his motion for pretrial immunity based on self-defense;

---

[1] OCGA § 16-5-2 (a).

[2] OCGA § 16-11-102.

[3] OCGA § 16-5-60 (b).

[4] OCGA § 16-5-70 (d) (2).

and (2) he received ineffective assistance of counsel. For the reasons that follow, we affirm.

Viewed in favor of the verdict,[5] the facts show that then 17-year-old Thompson met his then 15-year-old girlfriend, Jessica Lecroy, on the internet, and he traveled from his home in Savannah, Georgia, to the home of her mother, Opal, in Marietta, Georgia, in order to visit Jessica. Thompson first visited Jessica in September 2009. Thompson visited Jessica again in April 2010, but the two fought, and in May 2010, Jessica's uncle took Thompson to the bus station so he could return home to Savannah. Thompson was allowed to return to the Lecroy home later that summer, and he secured a job in the area.

On October 23, 2010, Opal was visiting her sister-in-law's home in Newnan, Georgia, and she attempted to speak with Jessica on the phone, but Thompson tried to prevent it. Opal, accompanied by her niece, Amanda Hawkins, went back to Marietta to confront Thompson and tell him to leave her home. Amanda's boyfriend, Daniel Langley (who was 19 at the time), Daniel's brother, Tyler (who was 16 at the time), and their friend, Josh Marando, traveled separately to meet Opal and her companions at the home. Upon learning of their intention to come to the home,

---

[5] See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998).

Thompson told Jessica that he would hurt them if they lay a finger on him. Thompson also told Officer David L. Smith that he was "going to be prepared for them."

When Opal and the others arrived at the home, Thompson unlocked the doors for them, and he and Amanda began to argue at which point Thompson pushed Amanda against the wall, tearing her shirt. Opal called Daniel, Tyler, and Josh (who had been waiting outside) into the house after Thompson pushed Amanda, and Opal searched for her home phones, which had been hidden under her mattress.

Daniel entered the living room to check on Jessica, whom Thompson had told to stay on the couch, but Thompson was standing in the middle of the room holding a silver .38 caliber handgun, which he pointed at Daniel and told him to "stop before I kill you." While Josh tried to pull Daniel away from the area, Tyler circled around the hallway to try and disarm Thompson by grabbing him across the chest and pushing his weapon hand away from Daniel. Thompson was able to get his arm away from Tyler's reach and shot him in the abdomen, causing Tyler to fall backward. Josh pulled Amanda out of the room after the gunshot, and Daniel attempted to retreat down the hall, but Thompson shot him in the back. As the wounded Tyler crawled

onto the couch, Thompson shot him in the forehead just above his eyebrow from only a few inches away. Tyler died from this injury.[6]

1. Thompson contends that the trial court erred by denying his motion for pretrial immunity pursuant to OCGA § 16-3-24.2 based on self-defense. We disagree.

OCGA § 16-3-21 (a) states that

[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

---

[6] Thompson does not challenge the sufficiency of the evidence on appeal, but we note that the facts as presented at trial support the jury's verdict. See OCGA §§ 16-5-2 (a); 16-5-60 (b); 16-5-70 (d) (2); 16-11-102; *Jones v. State*, 289 Ga. 145, 146-147 (1) (710 SE2d 127) (2011) (cruelty to children in the third degree); *Davis v. State*, 309 Ga. App. 831, 832-833 (1) (711 SE2d 324) (2011) (voluntary manslaughter); *Baker v. State*, 273 Ga. App. 297, 300 (2) (614 SE2d 904) (2005) (reckless conduct); *Richardson v. State*, 233 Ga. App. 890, 891 (505 SE2d 57) (1998) (pointing a pistol at another).

4

"In reviewing the denial of a motion for pretrial immunity, we must view the evidence in the light most favorable to the trial court's ruling and accept the trial court's findings of fact and credibility determinations if there is any evidence to support them."[7] The trial court assesses such motions under the preponderance of evidence standard, which

> means that superior weight of evidence upon the issues involved, which, while not enough to free the mind wholly from a reasonable doubt, is yet sufficient to incline a reasonable and impartial mind to one side of the issue rather than to the other. Nothing in this standard requires the elimination of all fact disputes as a matter of law. Rather, the standard requires only that the finder of fact be inclined by the evidence toward one side or the other.[8]

Thompson has not shown that the trial court erred by denying his motion for pretrial immunity. At the motion in limine hearing, the superior weight of evidence showed that Thompson (who was at most a house guest of Opal, who came to her own home in order to make Thompson leave) intended to use deadly force against the Langleys before they arrived at the scene, that Thompson brandished the weapon

---

[7] *Sifuentes v. State*, 293 Ga. 441, 444 (2) (746 SE2d 127) (2013), citing *State v. Bunn*, 288 Ga. 20 (701 SE2d 138) (2010).

[8] (Citation and punctuation omitted.) *State v. Bunn*, 288 Ga. at 22.

against them after physically attacking Hawkins and before any physical threat was made toward him, and that Thompson continued to use an unnecessary level of force by shooting an already injured Tyler in the head at close range and shooting a fleeing Daniel in the back. As such, there was no error on the part of the trial court in the denial of the motion for pretrial immunity.[9]

2. Thompson raises multiple claims of ineffective assistance of counsel.

Under *Strickland v. Washington*,[10]

[i]n order to establish ineffectiveness of trial counsel, appellant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.[11]

---

[9] See, e.g., *Sifuentes*, 293 Ga. at 444-445 (2)

[10] 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[11] (Citations and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004).

(a) First, Thompson argues that trial counsel was ineffective for failing to hire an expert to rebut the testimony of the medical examiner regarding whether Tyler could have been holding the weapon when it discharged.

On cross-examination of the medical examiner, the following exchange occurred:

[TRIAL COUNSEL]: You don't know who was holding the weapon when [the shot to Tyler's abdomen] hit[?]

[MEDICAL EXAMINER]: Who's holding the weapon?

[TRIAL COUNSEL]: Yeah, what you know is the aftereffects of the shot; right?

[MEDICAL EXAMINER]: I know the deceased wasn't holding the weapon.

[TRIAL COUNSEL]: How do you know that?

[MEDICAL EXAMINER]: Because he had no gunshot powder on his hands.

[TRIAL COUNSEL]: Did you do a gunshot residue test on his hands?

[MEDICAL EXAMINER]: You don't do that. You look for it.

[TRIAL COUNSEL]: You look for it, you didn't see anything?

[MEDICAL EXAMINER]: That's right. . . .

[TRIAL COUNSEL]: And you didn't have this fellow's clothes[?]

[MEDICAL EXAMINER]: No, I did not.

[TRIAL COUNSEL]: So you were not able to examine it for powder or residue or stippling or anything else that you've been able to talk about on the second shot.

[MEDICAL EXAMINER]: That's correct.

[TRIAL COUNSEL]: Okay. So you don't know as we stand here today how far away that first shot was when it was delivered.

[MEDICAL EXAMINER]: No, I do not.

[TRIAL COUNSEL]: I'm sorry, that's an inappropriate question. You don't know as we stand here today how far away the weapon was which delivered that shot.

[MEDICAL EXAMINER]: To the abdomen, that's correct.

Thompson argues that the medical examiner incorrectly stated that the proper way to assess the existence of gunshot residue is through a visual inspection of the

8

individual's skin. Thompson contends that his trial counsel was ineffective because he failed to properly prepare for the medical examiner's testimony, failed to present expert testimony in rebuttal to the testimony, and failed to request a continuance to present rebuttal evidence regarding this testimony. Thompson contends that because of counsel's failures, the jury was allowed to hear without rebuttal the medical examiner's erroneous statement regarding the test for gunshot residue and his equally erroneous conclusion based thereon that Tyler was not holding the gun in his hand when the first shot impacted his abdomen.

Thompson contends that this was prejudicial to him because it removed as a possible conclusion the hypothesis that Tyler and he were wrestling over the weapon, which accidentally discharged or was fired by Tyler himself, which trial counsel admitted at the motion for new trial hearing. Thompson also presented at the motion for new trial hearing an expert affidavit stating that the medical examiner testified incorrectly regarding the type of test used to detect gunshot residue; however, the affidavit does not contain any information regarding the individual's qualifications.

As counsel explained in an ex-parte hearing on the matter and at the motion for new trial hearing, "[t]here was never a question about who fired the gun. The question was what are the circumstances. And really, the circumstances of the first two shots,

I think there was no question at all about those. It was the circumstances of the third shot that the whole case turned on." At trial, counsel presented Thompson's claim of self-defense via the theory that Thompson held the gun when Tyler and Daniel were shot, but that in both cases, it was a result of Thompson defending himself. Counsel explained to the jury:

> I'm telling you right now there is no doubt [Thompson] shot those two boys, he's the only one [that] had a gun in his hand and he shot them both. The defense in the case is that he was justified under the law in shooting those boys to protect himself in a three-on-one situation where they had already told [him], "Tell your punk-ass boyfriend we're coming over today."

As for Thompson's argument that counsel failed to prepare for the medical examiner's testimony, the record shows that counsel was familiar with him from previous trials and did not believe that interviewing him would prove fruitful; instead counsel prepared by obtaining reviews of the report.[12] Trial counsel's cross-examination of the medical examiner was thorough and sifting, and he was able to extract helpful testimony from the witness on numerous occasions. Moreover, given the overwhelming evidence that Thompson shot Daniel in the back and Tyler in the

---

[12] See *Pippins v. State*, 263 Ga. App. 453, 459 (4) (b) (588 SE2d 278) (2003).

10

head while he was already wounded and on the sofa, it is unlikely that the medical examiner's statement affected the outcome of the trial.[13]

(b) Next, Thompson argues that trial counsel was ineffective for failing to move for a mistrial based on audience conduct during the trial.

"Demonstrations and outbursts which occur during the course of a trial are matters within the trial court's discretion unless a new trial is necessary to [e]nsure a fair trial."[14] At the motion for new trial hearing, counsel testified that the family of the victims was behaving poorly during the duration of trial, but he did not believe it was necessary to ask for a mistrial or curative instruction regarding their behavior because the trial court "unloaded" on them when it occurred, and he could not recall that any of the behavior occurred in front of the jury. At least one instance occurred

---

[13] See, e.g., *Gibbs v. State*, 316 Ga. App. 431, 432 (729 SE2d 563) (2012) ("Decisions based on counsel's reasonable trial strategy do not constitute deficient performance, and reviewing courts do not evaluate trial counsel's tactics and strategic decisions in hindsight.") (punctuation omitted); *Pippins*, 263 Ga. App. at 484-485 (4) (a) ("The decisions on which witnesses to call, whether and how to conduct cross-examination, which jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of counsel after consultation with the client. Trial counsel's strategic decisions made after thorough investigation are virtually unchallengeable. They provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them.") (punctuation omitted).

[14] *Sheppard v. State*, 235 Ga. 89, 91 (2) (218 SE2d 830) (1975)

during Thompson's testimony, and the trial court scathingly chastised the audience outside the jury's presence.

Thompson has not presented any evidence of the content of the outbursts or whether it was heard by the jury. Indeed, when the trial court issued its last warning on the matter, it indicated that the prosecutor may not have heard the statement because of his attention to the testimony. "Many, if not most, trials by jury involve some degree of emotion by at least one party or the other. It would be unreasonable to expect that all emotions be completely frozen during a trial by jury when such effective bridle on emotions cannot be sustained elsewhere."[15] Based on the record before us and the discretion with which the trial court has to act on such motions, we conclude that Thompson has not met his burden to establish ineffective assistance of counsel on this point.[16]

(c) Finally, Thompson argues that trial counsel was ineffective for failing to present witnesses at sentencing.

---

[15] (Punctuation omitted.) *Forney v. State*, 255 Ga. 316, 318 (3) (338 SE2d 252) (1986).

[16] See, e.g., *Sheppard*, 235 Ga. at 91 (2).

At the hearing on the motion for new trial, counsel explained that he thought the trial court already had heard a sufficient amount about Thompson's background during the trial and pre-trial phases, and the trial court recalled that counsel had argued for a lighter sentence based on Thompson's background. Accordingly, Thompson has failed to show that the evidence he would have offered in mitigation would have had a reasonable probability of changing the outcome of sentencing.[17]

Based on the foregoing, Thompson has failed to show that the trial court's denial of his motion for new trial on these bases was clearly erroneous.

*Judgment affirmed. Miller and Dillard, JJ., concur.*

---

[17] See *Deyoung v. State*, 268 Ga. 780, 786 (5) (493 SE2d 157) (1997).