## A03A0765. THE STATE v. GRADDY.
(585 SE2d 147)

ANDREWS, Presiding Judge.

The State appeals from the trial court's grant of Betty Sue Graddy's motion to suppress the evidence seized from her residence, a shop, shed, and trailer near her residence, and dismissal of the charges of manufacturing methamphetamine, possession of a firearm by a convicted felon, and manufacturing methamphetamine within 1,000 feet of a school for lack of probable cause.

1. When reviewing a trial court's order on a motion to suppress, where some facts are contested and some are not, this Court views the contested facts under the clearly erroneous standard, while review of the application of law to the uncontested facts is de novo. *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994); *Swan v. State*, 257 Ga. App. 704, 705 (572 SE2d 64) (2002).

We consider first the State's fourth enumeration of error, that the trial court erred in finding no probable cause for the issuance of a search warrant.

> In determining probable cause for a search warrant, the magistrate is merely to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before (the magistrate), including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *DeYoung v. State*, 268 Ga. 780, 787 (7) (493 SE2d 157) (1997), quoting *State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984). . . . Ultimately, this Court's role on review is to "determine if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search (warrant)." *DeYoung* at 787 (7). See also *Grier v. State*, 266 Ga. 170, 172 (2) (b) (465 SE2d 655) (1996).

(Footnote omitted.) *Abraha v. State*, 271 Ga. 309, 311 (1) (518 SE2d 894) (1999); see also *State v. Towe*, 246 Ga. App. 808-809 (541 SE2d 423) (2000).

When a warrant has been obtained and it is challenged, the burden of proving its invalidity is on the challenger. OCGA § 17-5-30 (a); *State v. Towe*, supra. Because of the Fourth Amendment's strong preference for searches conducted pursuant to a warrant, we accord substantial deference to the magistrate's finding of probable cause. *State v. Henderson*, 271 Ga. 264, 269-270 (4) (517 SE2d 61) (1999); accord *State v. Towe*, supra.

Graddy's motion alleged that the search warrant was issued

without probable cause, was based on stale information, and was overbroad. The trial court agreed.

The facts were that on January 23, 2002, Deputy Sheriff Lankford went to Graddy's residence on 440 Woodlake Drive looking for her son, Brad Graddy, for whom there was an outstanding arrest warrant. As Lankford drove up, he saw Brad Graddy pulling up to the Graddy residence in his truck and Lankford pulled his patrol car in front of the truck. Brad Graddy ran, and Lankford saw Andy Mills get out of Brad Graddy's truck and head toward his own truck parked nearby. Lankford detained Mills, at which point Betty Sue Graddy walked up to Brad Graddy's truck and said she did not know why they ran and that she saw Steve Nettles run around the side of her house.

Mills headed for his truck, but Lankford got him back out. As he did so, Lankford saw a very long knife, partially hidden under the seat, and arrested Mills for having a concealed weapon. In Brad Graddy's truck, Lankford found a backpack containing plastic tubing which, based on his training and experience, he believed was going to be used in making methamphetamine. Lankford seized the tubing and went through the backpack, in which he found a set of electronic scales, a methamphetamine recipe, and pictures of Nettles' children.

Mills then began giving information to Lankford regarding Brad Graddy's and Nettles' manufacturing of methamphetamine. Mills said that he had been at Betty Jean Lee's house the entire night, that he had seen a large quantity of dope, and that they were all using dope. He also said that Brad Graddy told him that "they was [sic] going to cook off a bunch of dope later that afternoon or that night." Mills also told Lankford that he had seen Brad Graddy cooking methamphetamine before at Brad Graddy's residence, a trailer near Betty Sue Graddy's house.

At this point, Lankford contacted Agent Blue of the South Georgia Drug Task Force and relayed this information to him. Blue then met Lankford and interviewed him. Based on that, Blue went to the jail along with Lankford and interviewed Mills. After Mills was advised of his rights, he told Blue the same information he had told Lankford. Lankford turned over to Blue the backpack and its contents. Blue then went to the magistrate and presented his affidavit and application for search warrants for both Lee's and Graddy's residences and curtilages.

In his affidavit, Blue stated that he had nine years experience and had conducted numerous drug investigations and set out the following:

> Within the past twenty-four (24) hours, Affiant spoke with Clinch County Sheriffs Deputy Lamar Lankford. Deputy

Lankford [s]tated that [he] had spoke [sic] with Andy Mills who is incarcerated in the Clinch County Sheriffs Department . . . , who is giving this statement against his penal interest, hereinafter referred to as Source A. Deputy Lankford has provided information to the Task Force, which has led to the seizure of narcotics. Based on the above information, Affiant believes Deputy Lankford and Source A to be reliable and worthy of belief. During Affiant's conversation with Deputy Lankford, [he] relayed the following information.

Within the past twenty-four (24) hours, He had received information from Source A. Source A reportedly was present at the residence described above [(Graddy's residence and premises)] and observed Brad Graddy with several articals [sic] to cook methamphetamine. According to Deputy Lankford, Source A has observed Graddy cook methamphetamine on numerous occasions. Source A also has seen a quantity of methamphetamines within the residence.

Further, based on independent investigation by AFFIANT reveals that the South Georgia Drug Task Force has previous received information [Brad] Graddy was manufacturing crystal methamphetamine at the residence. DEPUTY LANKFORD has personal knowledge that Sue along with Brad Graddy lives at the . . . residence. AFFIANT has personally confirmed the location and the description of the residence. AFFIANT has also noted that SOURCE A has given this information against his own penal interest.

Agent Blue also told the magistrate[1] that Mills had said he had been with Brad Graddy on several occasions at the residence manufacturing methamphetamine and had been at the residence of Jean Lee where he saw methamphetamine and people using methamphetamine. He further told the magistrate why Deputy Lankford had gone to Graddy's and what was found in the backpack in Brad Graddy's truck. It was Blue's understanding from talking to Lankford that Brad and Betty Sue Graddy lived at 440 Woodlake Drive and that was reinforced by Blue's conversation with the magistrate. During the execution of the search warrant, Graddy told Blue that Brad Graddy had been living in the trailer near her residence, but also lived inside the residence with her.

---

[1] Oral testimony presented to the magistrate may be considered in determining whether the warrant was properly issued. *Pettus v. State*, 237 Ga. App. 143, 144 (2) (514 SE2d 901) (1999).

The search warrant issued by the magistrate on January 23, 2002, authorized the search for the "person of Brad Graddy, and the residence of Sue Graddy including the entire curtilage of the house. . . ."

The property involved in the search was the home of Betty Sue Graddy and her recently deceased husband, Son Graddy. There was a small trailer, a shed, and a shop located on the property in addition to the Graddy residence. Son Graddy had run Graddy Post Company from the property, and the shop was used for truck repairs. Brown, Betty Sue Graddy's son-in-law, testified that after Son Graddy died, Betty Sue Graddy had kept the business going. Brown also testified that Brad and his wife, Shannon, lived in the trailer on the property "[w]hen they weren't on the run from the law," and that the whole family was aware of Brad Graddy's legal problems.

Upon arriving at the property, the officers presented the warrant to Betty Sue Graddy and intended to search the small trailer first, looking for Brad Graddy. Agent Blue asked Betty Sue Graddy who owned the trailer and she said she did. She also said that Brad Graddy had been living in the trailer, not paying rent, and also living at her residence. She stated that "he spent most of the time at her residence."

Brad Graddy was not in the trailer, and nothing of evidentiary value was found there. The officers then went to the residence. In the main bedroom near the garage, which officers believed was Brad Graddy's room, they located a Nursing 1996 drug handbook; Good Sense sandwich bags; glass chemical apparatus; a leather bag with several glass beakers; a glass drip tube with hair spray can tops wrapped in tin foil; a glass bottle with white powder; a glass pipe containing suspected methamphetamine; and three firearms. In the bedroom closet, the officers found three Tupperware containers with clear liquid inside. The lids of two were marked "blown" and "not blown." Based on Blue's experience in prior drug cases and education in the subject, he opined that the items found could be assembled into a methamphetamine lab and that the fluid was starting fluid, some already used and some not.

A total of twenty-nine firearms were found in the residence, a number in the living room in a gun case and two in what appeared to be Betty Sue Graddy's bedroom. Agent Blue was aware that Betty Sue Graddy had been convicted in federal court of racketeering. Special Agent Busbin located a computer in a room of the house and asked Betty Sue Graddy if he could search it, and she consented. Busbin found on the computer a recipe for methamphetamine which had been downloaded. It was similar to the recipe found in the backpack in Brad Graddy's truck.

In the small utility shed 25 to 30 feet from the house, Agent Blue

found a five-gallon bucket, a green tote bag, and a cardboard box. In the tote bag were ten boxes of antihistamine pills, a gas mask, thirty-nine coffee filters, two pieces of oxygen plastic tubing, and a can of WD 40. The box contained sippy cups, a Rubbermaid container, a two-gallon container with a spout, and a plastic eye dropper. In the bucket were muriatic acid, Liquid Fire drain cleaner, two wooden spoons with suspected methamphetamine residue, and a sippy cup. Based on Agent Blue's experience, it was his opinion that the Liquid Fire, the WD 40, the gas mask, coffee filters, and the antihistamine pills were all used in manufacturing methamphetamine.

Several tanks were found. One, containing anhydrous which is used in manufacturing methamphetamine, was found at the back door of the garage. Another containing propane was found in the shop along with a bottle of muriatic acid.

Agent Busbin also testified that, based on his experience in numerous drug investigations, a lab to produce methamphetamine could be set up with the items seized.

The magistrate properly found that there was probable cause to issue the search warrant for items used in the manufacture of methamphetamine.

2. The State's first enumeration is that the trial court erred in ruling that the reliability of Mills was not established and there was no proper basis laid for the reliability of the information provided by him. The trial court did err.

The trial court's order states that Mills' arrest for having a concealed weapon did not establish his reliability and that the fact that he had observed illegal activities did not establish that he was giving information against his penal interest.[2] In reaching this conclusion, the trial court failed to differentiate between a named and an unnamed informant.

> "When a *named* informant makes a declaration against penal interest and based on personal observation, that in itself provides a substantial basis for the magistrate to credit that statement." (Punctuation and footnote omitted; emphasis in original.) *Tomlinson v. State*, 242 Ga. App. 117, 119 (527 SE2d 626) (2000); see *State v. Wesson*, 237 Ga. App. 789, 791 (516 SE2d 826) (1999); *Sosebee v. State*, 227 Ga. App. 21, 23-24 (488 SE2d 102) (1997). [Graddy's] citation[s]

---

[2] The trial court's order implies disapproval of one officer providing hearsay information to another as the basis for probable cause. Officers are allowed to use such information supplied by another officer for this purpose. See, e.g., *Pitts v. State*, 212 Ga. App. 556 (1) (442 SE2d 797) (1994). Also, when the informant is a police officer, the reliability of the informant is presumed as a matter of law. *Williams v. State*, 239 Ga. App. 671, 672 (522 SE2d 43) (1999).

to *Robertson v. State*, 236 Ga. App. 68 (510 SE2d 914) (1999), [and other cases cited in her brief are] inapplicable, as the informant[s] in [those] case[s were] not named to the magistrate. See *Wesson,* supra, 237 Ga. App. at 791 (naming of informant to magistrate is key distinction).

*Swan v. State,* supra at 705 (1).

Here, Mills was in jail on a charge of possessing a concealed weapon. He admitted having witnessed Brad Graddy manufacture methamphetamine repeatedly, sometimes at the Graddy residence. The "entire night" before being arrested by police, Mills said he, along with Brad Graddy, had been at Lee's residence where he had seen a large quantity of dope and they were all using dope. Also, Brad Graddy was going to cook up another bunch that night. Mills was in the truck with Brad Graddy and Nettles and there was a backpack containing items which could be used to cook methamphetamine.

By admitting his presence during the making of methamphetamine, Mills was making statements against his penal interest. *Swan v. State,* supra; *Tomlinson v. State,* supra; see OCGA § 16-2-20 (party to a crime).

3. The State also urges error in the trial court's finding that the information submitted to the magistrate did not establish that the information was not stale. Again, we find that the trial court erred.

In determining if information is "stale," the proper procedure is " 'to view the totality of the circumstances for indications of the existence of reasonable probability that the conditions referred to in the sworn testimony would continue to exist at the time of the issuance of the search warrant.' [Cits.]" *Carruthers v. State,* 272 Ga. 306, 313 (5) (528 SE2d 217) (2000). The mere passage of time does not equate with staleness. See id. (passage of six months); *State v. Towe,* supra at 811 (2) (passage of thirteen days).

Further, an officer's inference that items sought will be at the place to be searched requires no more than a "fair presumption" to be reasonable. *Buckley v. State,* 254 Ga. App. 61, 62 (561 SE2d 188) (2002), citing *State v. Towe,* supra.

The fact that Mills did not provide the specific date that he witnessed Brad Graddy manufacture methamphetamine is not dispositive. "The magistrate must merely 'view the totality of the circumstances for indications of the existence of reasonable probability that the conditions referred to in the sworn testimony would continue to exist at the time of the issuance of the search warrant.' " (Footnote omitted.) *Buckley v. State,* supra at 62-63.

Here, the warrant was issued the same day that Mills, Nettles, and Brad Graddy were found in a truck on Graddy's premises with a

recipe for and equipment used in the manufacture of methamphet-amine and the expressed intention to cook some more that evening. The information was not stale. *Buckley v. State*, supra.

4. The trial court also erred, as urged by the State in its third enumeration, in concluding that the officers improperly searched premises and items not described in the affidavit and that the shop and shed were not part of the curtilage of the residence.

(a) Betty Sue Graddy acknowledged that the trailer in which Brad Graddy sometimes lived was hers. The shed and shop were located to the north of the trailer and between Graddy's house and the trailer. The shop and storage shed were located between 75 and 100 feet from Graddy's house.

As reflected above, the shop was part of the business of Son Graddy, which Betty Sue Graddy had kept going since his death. The shed was used for storage by Graddy family members. Therefore, regardless of the question of legal ownership of the realty upon which the shop and shed were located, it was apparent that Betty Sue Graddy was exercising dominion and control over them.

> "A warrant which authorizes the search of a particular dwelling extends by implication to areas within the curtilage of the dwelling. 'Curtilage' has been defined as 'the yards and grounds of a particular address, its gardens, barns, (and) buildings.' *Norman v. State*, 134 Ga. App. 767, 768 (216 SE2d 644) (1975)." *Landers v. State*, 250 Ga. 808, 809 (301 SE2d 633) [(1983)]. . . . Moreover, resolution of doubtful or marginal cases in this area should largely be determined by the preference accorded to searches conducted under the auspices of a warrant. *Davis v. State*, 266 Ga. 212, 213 [(465 SE2d 438) (1996)].

*McConville v. State*, 228 Ga. App. 463, 467 (2) (491 SE2d 900) (1997); see also *Meeks v. State*, 178 Ga. App. 9, 10 (2) (341 SE2d 880) (1986).

Curtilage here included the shed, shop, and trailer.

(b) Even assuming the trial court correctly decided the shop and shed were not within the curtilage, if Betty Sue Graddy disclaims ownership or an interest in the two buildings, she has no standing to complain of the searches conducted of them.

> " 'The Fourth Amendment right against unreasonable search and seizure is a personal right and may not be asserted vicariously.' (Citations and punctuation omitted.) *Randall v. State*, 194 Ga. App. 153, 154 (390 SE2d 74) [(1990)]. 'When, as in the instant case, the accused disavows ownership of [or other legitimate possessory interest in] the

[premises] searched, he has no legitimate expectation of privacy [there], and thus a search violates no right.' (Citations and punctuation omitted.) *Deych v. State*, 188 Ga. App. 901, 902 (1) (374 SE2d 753) [(1988)]."

*Henderson v. State*, 211 Ga. App. 102, 103 (2) (438 SE2d 181) (1993); see also *Nation v. State*, 252 Ga. App. 620, 623 (2) (556 SE2d 196) (2001).

5. The remaining two enumerations deal with the trial court's conclusion that there was no "probative evidence that [defendant] had possession of the guns as contemplated by the law prohibiting possession of a gun by a convicted felon. . . . [N]o probative evidence of conviction of a felony [was] presented," and no probable cause was shown to require Graddy to stand trial on the drug charges.

The purpose of a commitment hearing is not to make a final determination of guilt, but merely to determine whether there is probable cause to believe the accused is guilty of the charge. If such probable cause exists, it is the duty of the court to commit or bind over the accused to the grand jury for indictment. OCGA § 17-7-23 (a); *Jackson v. State*, 225 Ga. 39, 43 (1) (165 SE2d 711) (1969).

As discussed above in Division 2, information given by a police officer is presumed reliable. Therefore, Agent Blue's statement that Betty Sue Graddy had been convicted of racketeering was sufficient to show probable cause on this element of possession of guns by a felon. As to her possession of the guns, all twenty-nine were found in the house occupied by her, including two in her bedroom.

Regarding the drug charges, even on review of a verdict following trial, " 'where transactions involving relatives are under review[,] slight circumstances are often sufficient to induce a belief that there was collusion between the parties.' [*Robinson v. State*, 175 Ga. App. 769, 772 (2) (334 SE2d 358) (1985)]." *Smith v. State*, 253 Ga. App. 131, 134, n. 14 (558 SE2d 455) (2001). In *Lang v. State*, 171 Ga. App. 368, 369 (1) (320 SE2d 185) (1984), the issue was whether a father had aided and abetted a son who was manufacturing marijuana in a building on the father's farm.

There was probable cause for Betty Sue Graddy to be tried on these charges.

*Judgment reversed. Barnes and Adams, JJ., concur.*

DECIDED JULY 2, 2003 — ■■■■■■■■

Robert B. Ellis, Jr., District Attorney, Timothy L. Eidson, Assistant District Attorney, for appellant.

Berrien L. Sutton, for appellee.