## S95A1432. MITCHELL v. THE STATE.
### (467 SE2d 503)

SEARS, Justice.

The appellant, Michael Steven Mitchell, was indicted for three crimes relating to the death of Danny Hucks. Count 1 of the indictment charged Mitchell with the malice murder of Hucks; Count 2 charged him for the felony murder of Hucks, with aggravated assault as the underlying felony; and Count 3 charged him with the possession of a firearm during the commission of a crime. On the malice murder count, the jury found Mitchell guilty of voluntary manslaughter. On the felony murder and possession of a firearm counts, the jury found Mitchell guilty of the crimes charged. The trial court merged the voluntary manslaughter conviction with the felony murder conviction and sentenced Mitchell to life in prison for felony murder and to a term of five consecutive years for the offense of possession of a fire-

---

arm during the commission of a crime.[1] Mitchell appeals, contending that the principles of *Edge v. State*[2] require that we reverse the conviction for felony murder. We agree and remand for sentencing on the conviction for voluntary manslaughter.

1. The evidence at trial demonstrated that Mitchell and Hucks were involved with the same woman, Melissa Clark, for a number of years before the homicide. Clark testified that she had known Mitchell since they were freshmen in high school and that they dated from 1989 until late 1990 when they agreed to stop dating and to just remain friends. She met Hucks in May 1991, and started dating him shortly thereafter. She stated that she continued to see Mitchell and other high school friends initially, but that after she and Hucks had been dating awhile, Hucks became extremely jealous of her other friends and forbad her to see them. She added that Hucks destroyed her pictures of Mitchell. As an example of Hucks's extreme jealousy, Clark testified about an incident that occurred when Hucks and his grandmother came to pick up Clark to go to his grandmother's house. According to Clark, while driving there, Hucks opened the car door, pushed Clark's face out the door, and held her face close to the passing pavement, accusing her of being with someone the night before because he had not been able to reach her by phone. When they arrived at Hucks's grandmother's house, Hucks began heating safety pins with a lighter and telling Clark that he was going to push them under her fingernails. Clark started to cry, and Hucks put down the safety pins, got a pillow and started to suffocate her. Clark testified that Hucks's grandmother heard her crying and came to his room and told him to stop mistreating her; that she told his grandmother that she wanted to go home; and that Hucks then said, "you're not going anywhere." At that point, Hucks's grandmother threatened to call the police and reached for the phone, but Hucks pulled it out of the wall. Hucks's grandmother then hit Hucks with the phone, and Hucks reacted by stating "Hit me; I like it. You can't hurt me." Hucks's grandmother then told Hucks to get out of the house, and he began dragging Clark through the trailer park. Hucks's grandmother, however, caught up with them and told Hucks that she had called the police. He then ran off, and Hucks's grandmother took Clark home.

After she broke off her relationship with Hucks, his jealousy con-

---

[1] The crimes occurred on October 2, 1994. Mitchell was indicted on November 1, 1994. The jury returned its verdict on January 27, 1995, and the court sentenced Mitchell on February 14, 1995. Mitchell filed his notice of appeal on February 24, 1995, and the court reporter certified the transcript on April 27, 1995. The appeal was docketed in this Court on June 5, 1995, and was orally argued on September 18, 1995.

[2] 261 Ga. 865 (414 SE2d 463) (1992).

tinued. One day he came into her yard and started accusing her of being with someone else. He tried to grab her, but she ran into her house and closed the door. Clark stated that Hucks then pushed open the door, dragged her out of the house by her hair, and put her in a car. Hucks then began hitting her in the face, popping one of her eardrums. According to Clark, Hucks told her that " 'I have a gun under the seat,' " and " 'I'm going to kill you; there's a pond down the road and I'm going to dump you in that pond.' " Clark testified that Hucks then drove past the pond, pulled into the woods, and started yelling that " 'you've been with someone else.' " Clark denied it, and Hucks started punching her in the stomach, slapping and hitting her in the face, choking her, and slamming her head against the door over and over.

A friend of Clark testified that at a party he had completely funded, he and Clark went to the back of the house so that Clark could get some money and contribute to the costs. When they came back to the front of the house, Hucks told Clark's friend that Hucks wanted to fight him. Clark's friend said that he would not fight him, and Hucks slapped him in the face. The two then went outside and started fighting. Clark's friend pinned Hucks, then let him up, and went inside the house. Hucks came back in the house and insisted on fighting again. Clark's friend said no, and Hucks grabbed a knife from a kitchen table, sliced it across Hucks's arm, and threw blood on Clark's friend. Clark's friend decided that he should leave the party to avoid any further confrontation and did so.

In December 1993, Hucks went to prison, and Clark moved in with Steven Mitchell. Clark testified that Hucks then wrote a letter to her and Mitchell stating that "he better not catch Mitchell out of the neighborhood; he was going to get him." The day that Hucks got out of prison, he called Clark and Mitchell. Clark told him that she did not want to talk with him, that she was dating Mitchell. Hucks stated, " 'No, you're not, you're mine so no one else can have you.' " Hucks threatened to kill both Clark and Mitchell. According to Clark, Hucks stated that

> he was going to break in the house and get one of our butcher knives out of kitchen, come sit on the edge of the bed, and then dare us to move. And he said whenever one of us moved he said he was going to kill that person and make the other one watch and then kill them last. I said, Danny, I was going to call the police. He said, call the police. He said, "I'll be in there and kill the both of you and be gone before they can get there."

Clark stated that Hucks's phone calls went on for a week, and that she, Mitchell, and her parents went to the police to swear out a warrant on Hucks, but that they were told that they could not take out a warrant based on threats. Clark testified that over several months Hucks continued to call her and Mitchell repeatedly and threaten Mitchell in particular by stating that he (Hucks) was going to get Mitchell. Clark testified that about the first of October, she and Mitchell broke up for a few days; that Hucks found out about it; and told her that he wanted her to come see him. She added that she did so in the hope that "if I just did what he wanted that everything would be okay." She stated that she went to Hucks's house and did what he wanted, which was to have sex. According to Clark, she and Mitchell then got back together, making Hucks angry.

Shortly thereafter, on October 2, 1994, Clark had some friends, including Steven Mitchell, Gerald Buckaloo, Tammy Murdock, Kyle Spell, and Steven's brother, Jeff, come to her house. According to Mitchell and Clark, Hucks made repeated phone calls to the house. Mitchell testified that on one occasion he answered the phone and that Hucks told him, "I'm going to kill you, you pussy son of a bitch, put [Clark] on the God damned phone." Mitchell told Hucks that he and Clark had gotten back together and that Clark wanted Hucks to stop calling her. Hucks responded by stating, "I'm going to kill her, too. I'm going to come and rape and kill her and make you watch and then I'm going to kill you." Mitchell added that Hucks threatened to cut his throat from one end to the other, pull his tongue out the bottom, and drink his blood. According to Mitchell, Hucks said that if he did not meet him to fight, he would come over and kill them. Mitchell testified that he decided the best way to keep Hucks away from Clark was to meet him to fight, so he agreed to meet Hucks at an area known as the "sandpits." Gerald Buckaloo testified that he also spoke with Hucks that day and that Hucks told him he was going to kill Mitchell and "anybody else who wanted to get into it." Mitchell stated that he, Kyle Spell, and Jeff Mitchell then left Clark's house and drove to the sandpits.

Clark testified that after they left her house, she received a phone call which she did not answer but which was recorded by her answering machine. Clark immediately listened to the message, which was a threatening call from Hucks. She then called the police and turned the tape over to them that night. A tape recording of the message was introduced into evidence at trial. Hucks stated, "Steven, when I see you my heart's here; I'm here at the pits; I'm looking for you; I'm going to drink the blood from your body. I'll drink it. I'm going to kill you, you son-of-a-bitch. I'm going to keep calling."

Billy Grassmeyer, a friend of Hucks, testified that on the night of

the killing that Hucks and his cousin, Kenneth Richard, stopped by his house and asked him and Steve Smith, another friend of Hucks, to go to the sandpits. According to Grassmeyer, Hucks said that he was going to fight Steven Mitchell and that he was "going to kill some boys." Grassmeyer declined to go to the sandpits, but Smith left with Hucks and Richard.

Mitchell, his brother, and Kyle Spell drove to the sandpits in Spell's truck, and while en route, purchased shotgun shells for a 12-gauge shotgun that belonged to Spell. Hucks had already proceeded to the sandpits in Richard's truck with Smith, Richard, and one other friend. Smith and Richard testified that at the sandpits Hucks initiated the fighting by running over to where Spell's truck was parked, striking Mitchell and his brother a number of times with a large stick, and smashing the windshield of Spell's truck. Smith added that Hucks then said, "it ain't worth going back to the penitentiary for; . . . let's go," and started walking toward his truck. According to Smith and Richard, when Hucks got some distance from Mitchell and his friends, Mitchell leveled a shotgun at Hucks and fired, hitting Hucks. Mitchell, on the other hand, testified that Hucks said he was going to get his gun. Mitchell added that he believed that Hucks had a "shiny, metal or chrome object" and shot Hucks from a distance with the 12-gauge shotgun, wounding him in the shoulder. After Hucks was shot, according to Richard and Smith, he began crawling back toward Richard's truck. Smith then ran into the woods, and Richard got in his truck and drove up next to Hucks. Richard stated that he asked Hucks to get in the truck, but that Hucks declined, saying that he "wasn't finished." Richard then told Hucks that he was going to drive up to the top of a hill overlooking the sandpits. According to Richard, Hucks said, " 'Go, I'll be right there.' " Smith testified that he stopped in the woods to watch what would happen and hoped he could help Hucks. He added that he saw Mitchell stand over Hucks, lower the shotgun at Hucks's head, and fire, blowing off most of Hucks's head. Forensic evidence established that the shotgun barrel was in Hucks's mouth when the trigger was pulled. Mitchell testified that when he approached Hucks after the first shot was fired, Hucks was trying to get up and told Mitchell that " 'I'm going to kill you for real now because you shot me.' " Mitchell stated that he then knocked Hucks to the ground, that Hucks tried to get up again, saying that " 'when I get off this ground I'm going to kill you,' " and " 'you better kill me because I'm really going to kill you.' " Mitchell knocked Hucks down again, and Kyle Spell then handed Mitchell the shotgun. Mitchell stated that he aimed the gun down at Hucks, and that Hucks started pulling it back and forth, trying to take the gun from him. According to Mitchell, Hucks told him that Hucks was go-

ing to blow his head off, and that " 'I'm going to kill you; you better kill me.' " Mitchell testified that at that point he turned away and shot the gun.

Daniel Stangle, an acquaintance of Hucks, testified that in a previous and unrelated confrontation with Hucks, Stangle pulled a shotgun on Hucks because Hucks kept coming on his property and harassing him. According to Stangle, Hucks told Stangle to " 'shoot me, motherfucker,' " and grabbed the end of Stangle's gun and placed the barrel in his own mouth. Stangle testified that he then grabbed the gun out of Hucks's mouth and ran back in his house.

2. As previously noted, the jury convicted Mitchell of voluntary manslaughter on the malice murder count of the indictment, and also convicted him of felony murder and possession of a firearm during the commission of a crime. Mitchell's sole contention on appeal is that the felony murder conviction cannot stand under the rationale of *Edge*.

In *Edge* we held that where a jury returns a verdict for voluntary manslaughter, it cannot also return a verdict for felony murder based upon the same aggravated assault.[3] Here, there was only one homicide, but there were arguably two aggravated assaults: The first shotgun blast from a distance and the second blast with the barrel placed in the victim's mouth. We thus need to determine whether one aggravated assault could have supported a voluntary manslaughter conviction and one a felony murder conviction. If so, then *Edge* would be no impediment to sentencing Mitchell for felony murder. In order for this theory to support the felony murder conviction in this case, the state would have had to prove beyond a reasonable doubt that the first shot would have been fatal to Hucks, since if there was not such evidence, the first shot could not support a conviction for any form of homicide.[4] In this regard, the medical examiner testified that the cause of death was a shotgun wound to the head. He added that Hucks had suffered some more distant pellet wounds on his left arm, the side of his neck, and on his back, but he testified, at one point, that these did not contribute to Hucks's death and at another point, that he "saw nothing from the more distant shotgun wound that would have been fatal." Further, the evidence from the eyewitnesses to the crime is consistent with the medical examiner's testimony that the distant shotgun wound would not have caused death. Given this evidence, and the fact that there is no evidence contradicting it, we must conclude that the evidence is insufficient to establish beyond a

---

[3] Id. at 865-868.

[4] In resolving this issue, we put aside any due process issue of whether Mitchell had sufficient notice the state would attempt to convict him under this theory.

reasonable doubt that the first assault caused Hucks's death and is therefore insufficient to support a homicide conviction of any type based solely upon that assault. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Accordingly, even assuming there were two aggravated assaults and that the jury considered each one separately, the only aggravated assault that could possibly form the basis of a homicide conviction was the second one. We therefore must assume then that the jury convicted Mitchell of both voluntary manslaughter and felony murder based only on the second aggravated assault. Accordingly, the jury's verdict of voluntary manslaughter on Count 1 of the indictment means that it found the second assault to be mitigated by provocation and passion. Thus, under the principles of *Edge*, the felony murder conviction, based upon that same assault, must be reversed.

There is an additional reason we must reach this holding. In *Lindsey v. State*,[5] the state presented evidence that the defendant fired a semi-automatic weapon at a car containing three people. The defendant killed one passenger, and was charged with malice murder, felony murder, and three aggravated assaults. The jury found the defendant guilty of voluntary manslaughter on the malice murder count of the indictment and of felony murder and three aggravated assaults. The indictment, however, did not specify which assault was the underlying felony for felony murder, and the jury was not required to state which aggravated assault formed the basis of the felony murder conviction. For this reason, this Court was

> unable to determine whether the jury used the aggravated assault of the decedent as the underlying felony, which would require vacation of the felony murder conviction and affirmance of the voluntary manslaughter conviction, or whether the jury relied upon either of the aggravated assaults perpetrated against the surviving victims.[6]

Holding that we were required to give the defendant the benefit of the doubt in construing an ambiguous verdict, we had to conclude that the jury based its verdict on the aggravated assault on the decedent, and that *Edge* thus required that the felony murder conviction be vacated and that the defendant be sentenced for voluntary manslaughter.[7]

In the present case, the malice murder count of the indictment

---

[5] 262 Ga. 665 (424 SE2d 616) (1993).
[6] Id. at 666.
[7] Id.

did not specify whether the first or second gunshot was the assault upon which it was based. Further, the felony murder count specified "aggravated assault" as the underlying felony, but likewise did not specify whether the aggravated assault was the first or second gunshot. The trial court's charge to the jury was similarly vague, and the jury was not required to specify which assault it relied upon as the underlying felony for the felony murder conviction or which assault formed the basis of the voluntary manslaughter conviction. We are thus unable to determine whether the jury used the same assault as the basis for its voluntary manslaughter and felony murder convictions, which would require that we set aside the felony murder conviction under *Edge*, or whether it relied on separate assaults for each conviction. Giving the defendant the benefit of the doubt in construing this ambiguous verdict, we must conclude the jury relied on the same assault for both the voluntary manslaughter and felony murder convictions, and *Edge* thus requires that we set aside the felony murder conviction.

3. As the evidence is sufficient to support the conviction for voluntary manslaughter, *Jackson v. Virginia*, we remand the case to the trial court for it to sentence Mitchell for that offense.

*Judgment reversed and case remanded. All the Justices concur, except Hunstein, Carley, Thompson and Hines, JJ., who concur in the judgment only.*

DECIDED FEBRUARY 5, 1996.

*Michael C. Garrett*, for appellant.

*Daniel J. Craig, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Richard J. Warren, Assistant Attorney General*, for appellee.