309 Ga. 153
FINAL COPY

S20A0227, S20X0228. GARDHIGH v. THE STATE; and vice versa.

NAHMIAS, Presiding Justice.

Appellant Corey Gardhigh was found guilty of voluntary manslaughter, felony murder, and other crimes in connection with the beating death of Paul Grady. In his appeal, Case No. S20A0227, Appellant contends that the trial court erred by denying his pretrial motion for immunity, that the evidence presented at his trial was insufficient to support his convictions, and that the trial court abused its discretion by denying his motion for a new trial on the general grounds. In Case No. S20X0228, the State cross-appeals, contending that the trial court erred by sentencing Appellant for voluntary manslaughter and vacating his sentence for felony murder under the modified merger rule adopted in *Edge v. State*, 261 Ga. 865 (414 SE2d 463) (1992), and by giving the jury an instruction on voluntary manslaughter. As explained below, in Case

No. S20A0227, we affirm Appellant's convictions, and in Case No. S20X0228, we affirm the sentences the trial court imposed and dismiss the portion of the cross-appeal that seeks to challenge the jury instruction.[1]

[1] The crimes occurred on December 27, 2016. On March 10, 2017, a Floyd County grand jury indicted Appellant for malice murder; one count of felony murder predicated on both aggravated assault and aggravated battery; aggravated battery; two counts of aggravated assault (one based on assault with a deadly weapon, and the other on assault with intent to kill); and two counts of cruelty to children in the third degree (one against Appellant's son, and the other against his daughter). A trial was held from January 22 to January 25, 2018, and the jury found Appellant not guilty of aggravated assault with intent to kill and child cruelty against his daughter, but guilty of voluntary manslaughter as a lesser offense of malice murder and all of the remaining counts.

The trial court initially sentenced Appellant to serve life in prison for felony murder and one consecutive year for child cruelty; the court merged the voluntary manslaughter and the aggravated assault with a deadly weapon and aggravated battery counts into the felony murder conviction. Appellant filed a timely motion for new trial, which he amended twice with new counsel. After a hearing, on June 27, 2019, the trial court denied Appellant's motion but vacated his sentence for felony murder under the *Edge* modified merger rule. The court then resentenced Appellant to serve 20 years in prison for voluntary manslaughter and one consecutive year for child cruelty, ruling that the felony murder count was vacated by operation of law and the remaining counts merged into the voluntary manslaughter conviction.

Appellant filed a timely notice of appeal, and the State filed a timely notice of cross-appeal. The case was docketed in this Court to the term beginning in December 2019 and submitted for a decision on the briefs.

We note that although Appellant was not convicted of a murder offense, the jury found him guilty of felony murder and the State is properly challenging the trial court's decision not to convict and sentence Appellant for that murder count. Accordingly, this Court has subject matter jurisdiction over

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. During the summer of 2016, Appellant began working for Grady's painting business. Grady regularly paid Appellant until around Thanksgiving, when the business's earnings slowed. At the end of November, Grady did not pay Appellant as scheduled for a few weeks of work that Appellant performed.

In early December, Appellant began sending Grady text messages demanding to be paid. Grady intermittently replied, at one point telling Appellant that he would "get it squared away," but he continued not to pay Appellant. On December 22, Appellant texted Grady saying that he would not be able to buy Christmas gifts for his children, and his text messages then became increasingly

these cases. See, e.g., *State v. Owens*, 296 Ga. 205, 208 (766 SE2d 66) (2014) (deciding the State's appeal where the defendant was found guilty of murder counts and the State challenged the trial court's judgment convicting and sentencing the defendant for lesser offenses); *Neal v. State*, 290 Ga. 563, 567 (722 SE2d 765) (2012) (Hunstein, J., concurring, joined by all other Justices) (explaining that this Court has jurisdiction over all murder cases). See also *State v. Mondor*, 306 Ga. 338, 339 n.2 (830 SE2d 206) (2019) (explaining that where this Court has subject matter jurisdiction over a cross-appeal, the Court has jurisdiction over the whole case including the underlying appeal).

threatening. One of the messages sent by Appellant said, "Paul I promise you when I see you it's not going to be a good day for you buddy," and another said, "I made sure your business went well, I'm not going to [give] a f**k about your family and my freedom." On December 23, Grady agreed to leave a paycheck for Appellant in Grady's mailbox, and Appellant picked up the check from the mailbox later that evening.

Appellant waited until the next Tuesday, December 27, to cash the check. That afternoon, Appellant's mother Marian Grant drove him to the bank to cash the check; she was driving a white Chevrolet Malibu, and Appellant's 11-year-old son C. G. and his three-year-old daughter were passengers in the car. When Appellant got to the bank, he tried to cash the check but was turned away because Grady's account did not have sufficient funds. Appellant became upset and told the bank teller, "I'm going to kill him." Appellant then left the bank, and Grant drove the group to a relative's house to drop off Christmas gifts. After spending about 20 minutes there, Appellant asked Grant to drive him to Grady's house in Floyd

County so that he could talk to Grady about the check, and Grant obliged.[2]

When they got to Grady's house, Grant parked the car beside the curb at the end of Grady's driveway. Appellant got out of the car, walked up the driveway and the three or four brick steps to Grady's front porch, and knocked on the door. Grady came outside and stood on the porch while Appellant moved down to the bottom step. The two men spoke for five to ten minutes. According to C. G., Appellant and Grady briefly argued; Grady made a lunging motion and possibly spit at Appellant; and Appellant then grabbed Grady, threw him down the stairs onto a concrete sidewalk, and punched him two or three times. C. G. did not see Appellant fall down the steps.[3] Grant got out of the car and started yelling Appellant's name. Appellant then got up and ran back to the car and got inside, and

---

[2] Grant testified that Appellant was not angry when she drove him to the bank to cash his check, and C. G. testified that Appellant was not angry on the way to Grady's house.

[3] Grant testified that Grady lunged at Appellant; Grady then wrapped his arms around Appellant and they fell together; Appellant's hands were down by his side when the two men fell; Grady landed on top of Appellant; and Appellant did not punch Grady.

Grant drove away. Appellant's hands were bleeding when he got back in the car, and the jury was shown photos taken later that evening of his injured knuckles.

At some point during the altercation, Grady's stepson S. M., who was inside the house, heard Grady and another man yelling and then a loud bang, so he looked out a window and saw a man running down the driveway toward a white four-door car. S. M. then went out the front door and found Grady lying at the bottom of the stairs with his back and head on the concrete sidewalk and his legs up against the railing of the stairs; a large pool of blood had gathered under his head. S. M. saw the white car drive away and called 911. First responders arrived and took Grady to the hospital. He was unable to respond coherently to questions, appeared to have significant injuries to his face including a "smashed" nose and a gash above his eyebrow, and had blood coming out of his mouth and eyes. A check with blood and Appellant's name on it was found lying on the steps.

After leaving Grady's house, Grant drove back to her house,

where Appellant was living. On the way there, Appellant told C. G., "I'm not going to let anybody run over my life." When they got to the house, Appellant took a shower and changed clothes.

Later that evening, Appellant was arrested, taken to the Floyd County Police Department, and interviewed. The interview was video-recorded and played for the jury at trial. Appellant said that he was upset about not getting paid because he could not buy Christmas gifts for his children; that he sent the threatening text messages to Grady only to get Grady to respond; that he went to Grady's house only to talk to Grady about the check; that he was "cool, calm, and collected" on the way to Grady's house; that he told Grady that he could not cash the check and asked what Grady was going to do about it, Grady told him that he could take something off of Grady's truck to pawn for money, and Appellant replied that he did not work for pawned items; that he then saw Grady lunge at him and felt threatened, so he "bear-hugged" Grady and twisted Grady off the porch onto the ground; that Grady landed on his own back, covered his face with his arms, and started grunting; that he did not

see any blood on Grady; that he did not punch Grady; that after they fell, he heard Grant yelling his name so he immediately jumped up and ran back to the car; that he had heard Grady struggling to breathe but did not think he should call 911 because "[Grady] didn't think about my kids on Sunday morning" (Christmas Day); that he could not explain how Grady received significant facial injuries; and that Appellant received the injuries on his hands when they scraped the side of Grady's house and the concrete when he fell. Appellant was then charged with aggravated battery and booked into jail.

Grady remained unresponsive in the hospital, and eight days later, he died from his injuries. The medical examiner who performed Grady's autopsy testified that Grady died from blunt force head trauma. He had 24 separate injuries, including three injuries to the right side, left side, and back of his head; numerous lacerations and bruises on his face; and significant bleeding and swelling of his brain. Grady's injuries were consistent with his face and both sides and the back of his head having had multiple impacts against hands, steps, or concrete, and all of his injuries were

consistent with having been sustained contemporaneously. When asked which of Grady's injuries was the most serious, the medical examiner replied, "You can't separate them."

Appellant did not testify. His theory of defense was that he was justified in grabbing Grady after Grady lunged at him, and that Grady was then accidentally injured from falling onto the concrete sidewalk.

*S20A0227. Gardhigh v. The State*

2. Before trial, Appellant moved for immunity from prosecution pursuant to OCGA § 16-3-24.2, claiming that he acted in self-defense after Grady lunged at him. The evidence presented by the State at the hearing on the immunity motion was essentially consistent with the trial evidence just summarized in Division 1. However, Appellant also testified at the hearing as follows: after he sent the seemingly threatening text messages to Grady, he called Grady and said that the messages were not meant as threats; he did not tell the bank teller that he was going to kill Grady; he was not yelling at Grady when he and Grady were talking on Grady's porch; Grady

started to get "explosive" when Appellant told Grady that he did not work for pawned items; Grady lunged at him, he saw Grady's hands move forward, and he felt threatened, so he knocked Grady's hands down and allowed Grady's body to fall on him, but the two men twisted as they fell together and Grady landed on Grady's back; Appellant scraped his hands on the wall of the house as he was falling; he did not punch Grady but immediately jumped up from the ground because he heard Grant yelling for him; he was afraid when Grady lunged at him because he knew that Grady usually carried a large knife and he could not see if Grady had the knife when he lunged; as he was leaving, he saw Grady trying to get up from the ground and falling again; and he did not call 911 because he did not think that Grady's injuries "rose to the level" of calling for help.

The trial court denied Appellant's motion for immunity, ruling that he had not established by a preponderance of the evidence that he acted in self-defense because the physical evidence significantly contradicted his version of events, his testimony deviated from the statements that he made to the police during his recorded interview,

and he was not a credible witness. Appellant contends on appeal that the trial court erred by denying the motion because he proved that he was entitled to immunity by a preponderance of the evidence. We disagree.

Under OCGA § 16-3-21 (a), a person is justified in using deadly force against another person when he reasonably believes that "such force is necessary to prevent death or serious bodily injury to himself." OCGA § 16-3-24.2 says in pertinent part that "[a] person who uses threats or force in accordance with Code Section 16-3-21 . . . shall be immune from criminal prosecution therefor . . . ." Unlike at trial, where the State must disprove a defendant's claim of self-defense beyond a reasonable doubt, the defendant bears the burden to show that he is entitled to immunity from prosecution by a preponderance of the evidence. See *Sifuentes v. State*, 293 Ga. 441, 444 (746 SE2d 127) (2013). When reviewing the denial of an immunity motion, this Court "must view the evidence in the light most favorable to the trial court's ruling, and accept the trial court's findings of fact and credibility determinations if there is any

evidence to support them." Id.

Viewed in that light, the evidence presented at the pretrial immunity hearing supported the trial court's conclusion that Appellant did not act in self-defense. The physical evidence showed that Grady received serious injuries to both sides and the back of his head and to his face. That evidence was consistent with C. G.'s account that Appellant threw Grady down the steps and then punched him as he lay on the ground. Even if Grady lunged at Appellant, the court could find that Appellant was not entitled to slam Grady onto a concrete sidewalk and then punch him multiple times with enough force to cause the significant facial injuries and brain damage that led to his death. See *Nelson v. State*, 283 Ga. 119, 120 (657 SE2d 201) (2008) ("A homicide is not justified if the force used by the defendant exceeds that which a reasonable person would believe was necessary to defend against the victim's unlawful act.").

In addition, Appellant's testimony at the immunity hearing deviated in significant respects from the testimony of other witnesses and from the statements that he gave the investigators

during his interview. Among other things, Appellant never told the police that he thought Grady might have a large knife when Grady lunged at him, and he told the police that he did not call 911 after the altercation because Grady did not think about his children on Christmas Day, not because he did not think Grady's injuries were serious. These inconsistencies supported the trial court's finding that Appellant was not a credible witness. For these reasons, the court was authorized to deny Appellant's motion for immunity. See *Arnold v. State*, 302 Ga. 129, 132 (805 SE2d 94) (2017); *Hornbuckle v. State*, 300 Ga. 750, 752-753 (797 SE2d 113) (2017); *Sifuentes*, 293 Ga. at 444-445.

3. Appellant also contends that the evidence presented at his trial was insufficient to support his "convictions" for voluntary manslaughter and felony murder, because the State did not disprove his self-defense claim beyond a reasonable doubt. When reviewing the sufficiency of trial evidence as a matter of constitutional due process, this Court views the evidence in the light most favorable to the verdicts, giving deference to the jury's assessment of the weight

and credibility of the evidence. See *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

To begin with, Appellant was convicted of and sentenced for only voluntary manslaughter and the count of child cruelty against his son C. G., so his claim regarding the felony murder count is moot. See *Rosser v. State,* — Ga. — (842 SE2d 821) (2020). And as we have explained many times, because "issues of witness credibility and the existence of justification are for the jury to determine," the jury was "free to reject [Appellant's] claim that he acted in self-defense." *Ivey v. State,* 305 Ga. 156, 159 (824 SE2d 242) (2019) (citation and punctuation omitted). The trial evidence was sufficient for a rational jury to find that the State had disproved Appellant's self-defense claim and had proved him guilty of voluntary manslaughter beyond a reasonable doubt. See, e.g., *Muckle v. State,* 307 Ga. App. 634, 636-638 (705 SE2d 721) (2011).[4]

---

[4] Although Appellant does not specifically challenge his conviction for child cruelty in the third degree, consistent with this Court's usual practice in murder cases, we have reviewed the record and conclude that the evidence was also sufficient to support that conviction, as Appellant committed a forcible

4. Finally, Appellant contends that the trial court abused its discretion by denying his motion for new trial on the general grounds, see OCGA §§ 5-5-20 and 5-5-21, because the verdicts were contrary to and strongly against the weight of the evidence. In its order denying Appellant's motion for new trial, the trial court first found the evidence legally sufficient under the *Jackson v. Virginia* standard. Under the separate heading "General Grounds," the court explicitly noted its discretion in granting or denying a new trial on the general grounds and then concluded that

> the jury's verdict in this case was not decidedly and strongly against the weight of the evidence favoring [Appellant's] guilt. Furthermore, the evidence presented was not "sufficiently close" to warrant this Court's exercise of its discretion as the thirteenth juror.

The trial court did not abuse its discretion. See *Wilkerson v. State*, 307 Ga. 574, 575 (837 SE2d 300) (2019); *Smith v. State*, 300 Ga. 532, 534 (796 SE2d 671) (2017).

*S20X0228. The State v. Gardhigh*

---

felony seen and heard by his 11-year-old son. See *Jackson*, 443 U.S. at 319. See also OCGA § 16-5-70 (d) (2); *Dennard v. State*, 305 Ga. 463, 465-466 (826 SE2d 61) (2019).

5. In its cross-appeal, the State argues that the trial court erred (a) by sentencing Appellant for voluntary manslaughter and vacating the felony murder count because the *Edge* modified merger rule does not apply, and (b) by giving the jury a charge on voluntary manslaughter. The first argument is meritless, and the State is not entitled to appeal the jury instruction issue.

(a) This Court held in *Edge* that when a defendant is found guilty of both voluntary manslaughter and felony murder based on the same underlying aggravated assault, the defendant should be convicted and sentenced only for voluntary manslaughter. See *Edge*, 261 Ga. at 865-866.

> In that scenario, we explained, it must be presumed that the jurors found the underlying aggravated assault to be the product of provocation and passion. We reasoned that to hold otherwise would eliminate voluntary manslaughter as a separate form of homicide. This was so because almost every voluntary manslaughter involves a felonious assault.

*Griggs v. State*, 304 Ga. 806, 807-808 (822 SE2d 246) (2018) (citations and punctuation omitted). We have extended this modified merger rule "to other fact patterns in which the felony murder is

premised on 'another underlying felony that is equally integral to the homicide and susceptible of mitigation by the sort of provocation and passion that voluntary manslaughter involves,'" id. at 808 (citation omitted), including in particular the underlying felony of aggravated battery, see *Sanders v. State*, 281 Ga. 36, 37-38 (635 SE2d 772) (2006).

In this case, the jury found Appellant guilty in pertinent part of voluntary manslaughter (as a lesser offense of malice murder), felony murder based on aggravated assault and aggravated battery, aggravated assault with a deadly weapon, and aggravated battery. The trial court initially convicted and sentenced Appellant to serve life in prison for the felony murder count, merging those other counts into that conviction. Appellant raised an *Edge* claim in his motion for new trial, however, and while the trial court denied the motion, it ruled that

> [b]ecause the aggravated assault and aggravated battery were both integral to the killing of [Grady], the underlying felonies are subject to the modified-merger rule, and the Court should have sentenced [Appellant] for the voluntary manslaughter conviction.

The court therefore vacated Appellant's sentences and then resentenced him to serve 20 years in prison for voluntary manslaughter, merging the other pertinent counts into that conviction. The trial court's ruling was correct.

Asserting that "*Edge* does not address a situation in which the jury has found an independent basis for malice, apart from an aggravated assault," the State argues that *Edge* does not apply in this case because the jury found Appellant guilty of aggravated battery, which requires a finding of malicious intent. See OCGA § 16-5-24 (a) (defining the offense of aggravated battery as "maliciously caus[ing] bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof"). *Edge* does not actually suggest the limitation that the State asserts, however, and the State's argument is directly contrary to our holding in *Sanders*. Moreover, almost every voluntary manslaughter involves an underlying aggravated battery

as well as an aggravated assault, so to hold as the State suggests would essentially eliminate voluntary manslaughter as a separate form of homicide in this State. See *Griggs*, 304 Ga. at 807-808.

The State also argues that *Edge* does not apply because there was evidence that Appellant first threw Grady onto a hard surface and then punched him, so the jury could have found that Grady suffered non-fatal injuries from Appellant's first act (which the State says formed the basis for the aggravated assault count and could support the voluntary manslaughter verdict), and then suffered fatal injuries from Appellant's second act (which the State says formed the basis for the aggravated battery count and supports the felony murder verdict). The State's assertion that an aggravated assault that caused non-fatal injuries could support the voluntary manslaughter verdict is puzzling, because to be guilty of voluntary manslaughter, a defendant must commit an act that "causes the death of another human being[.]" OCGA § 16-5-2 (a). In any event, the State's newly crafted distinctions between the conduct underlying the counts is not how it indicted or proved this case.

The indictment did not distinguish between the conduct forming the basis of the aggravated assault and aggravated battery counts in the way the State now proposes. The aggravated assault with a deadly weapon count was based on Appellant's alleged conduct in "beating and punching [Grady] and grabbing and throwing [Grady] down multiple steps," and the aggravated battery count was likewise based on Appellant's alleged conduct in "beat[ing] [Grady], sling[ing] [Grady] down some steps, and [engaging] in a physical altercation with [Grady] which resulted in a fall and injuries to the face and head of [Grady]." The malice murder count also was based on Appellant's "beating [Grady], slinging [Grady] down some steps, and seriously injuring [Grady] in a physical altercation which resulted in [his] death," and the felony murder count alleged simply that "aggravated assault and aggravated battery. . . resulted in [Grady's] death[.]"

The State then did not seek to prove the charges with the distinctions it now imagines. The medical examiner determined that Grady's death was caused by blunt force head trauma but did not

identify a particular fatal blow; to the contrary, she testified that all of his injuries were consistent with being sustained contemporaneously, and when asked which of the injuries was the most serious, she replied, "You can't separate them." The witnesses similarly described the altercation between Appellant and Grady as involving multiple wounds inflicted in quick succession, which generally do not constitute distinct criminal acts. See *Regent v. State*, 299 Ga. 172, 174 (787 SE2d 217) (2016). And although the closing arguments were not transcribed, the State does not represent that it made any argument that distinct acts supported the separate counts.

Thus, there is no reason to believe that the jury actually found Appellant guilty of voluntary manslaughter and felony murder based on distinct conduct causing Grady's death, and the trial court did not err in applying *Edge* to vacate the felony murder count and sentence Appellant for voluntary manslaughter. See *Mitchell v. State*, 266 Ga. 197, 203 (467 SE2d 503) (1996); *Lindsey v. State*, 262 Ga. 665, 665-666 (424 SE2d 616) (1993).

(b) The State also contends that the trial court erred by giving the jury a charge on voluntary manslaughter. However, OCGA § 5-7-1 lays out an exhaustive list of grounds for a State appeal, and it does not authorize the State to appeal or cross-appeal this jury instruction issue. See OCGA § 5-7-1 (a) (not listing jury instructions as a ground for a State appeal), (c) (authorizing the State generally to cross-appeal only when the defendant is granted an interlocutory appeal and only as to matters "ruled on prior to the impaneling of a jury or the defendant being put in jeopardy"). Compare OCGA § 5-7-1 (a) (6) (authorizing the State to appeal from judgments that are "void," which has been interpreted to allow appeals from sentences that are void due to merger errors, see *State v. Hanna*, 305 Ga. 100, 102 (823 SE2d 785) (2019)). Accordingly, the State cannot appeal the jury instruction issue, and we dismiss that portion of the cross-appeal. See *State v. Cash*, 298 Ga. 90, 91-94 (779 SE2d 603) (2015).

*Judgment affirmed in Case No. S20A0227. Judgment affirmed in part and cross-appeal dismissed in part in Case No. S20X0228. All the Justices concur.*

DECIDED JUNE 16, 2020.
Murder. Floyd Superior Court. Before Judge Sparks.

*J. Ross Hamrick, Sean J. Lowe*, for appellant.

*Leigh E. Patterson, District Attorney, Luke A. Martin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.