**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 3, 2022**

# In the Court of Appeals of Georgia

A21A1710. JENNINGS v. THE STATE.

PHIPPS, Senior Appellate Judge.

A jury found Robert Christopher Jennings guilty of voluntary manslaughter, two counts of aggravated assault, and three counts of possession of a firearm during the commission of a felony,[1] and the trial court sentenced him on the convictions. Jennings appeals from the denial of his motion for a new trial, as amended, asserting that (1) the evidence was insufficient to sustain his conviction for voluntary manslaughter, and (2) the trial court erred in denying his pretrial motion for immunity. For the following reasons, we affirm Jennings's convictions.

---

[1] The jury found Jennings not guilty of malice murder and one count of possession of a firearm during the commission of a felony, and the trial court vacated and dismissed one conviction for possession of a firearm during the commission of a felony.

In reviewing the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Conflicts in the testimony of the witnesses are a matter of credibility for the jury to resolve.

*Aeger v. State*, 356 Ga. App. 667, 667-668 (1) (848 SE2d 677) (2020) (citation and punctuation omitted).

Viewed in that light, the record shows that the trial in this case spanned six days and included twenty-five witnesses for the State, including numerous individuals involved in the altercations with Jennings and neighbors who witnessed the altercations, one witness for the defense, and testimony from Jennings. According to the testimony, Jennings confronted a group of children at his mobile home park, ranging in age from nine to fourteen, about whether they had taken his son's football. A few older teenagers got involved when the conversation grew heated and Jennings became aggressive. Jennings continued to shout and swear at the group, and, at some point, he took out a gun. Many in the group walked away when they saw the gun, but Jennings continued acting aggressively. In fact, he held the gun to the face of one of the boys. Then he told the group that he was going to get his nephews to "beat [them]

2

up." When Jennings eventually returned to his yard, he fired a warning shot in the air and told the group not to come to his house. Jennings then drove away from the area with his children.

Jennings left his children at his mother's house, drove back to the mobile home park with two of his nephews, and pulled in front of a neighboring house, near the victim's home. One of Jennings's nephews testified that when they arrived at the mobile home park, he saw people standing around. Some individuals were on Jennings's parking pad, and other individuals were across the street in front of a different house. Jennings's nephews stayed near his car. Jennings, however, got out of the car, retrieved a gun from the trunk, and started walking toward the group that had been on his parking pad as the group began walking toward him. Witnesses testified that Jennings waved his gun – which was purple – and ran toward the group, yelling at them to get off his property. According to one of Jennings's nephews, Jennings was the only one with a gun at that point. Someone told Jennings to put the gun down, but Jennings struck a boy in the face with the gun, breaking both sides of the boy's jaw and causing the gun to discharge. Numerous witnesses testified that the boy Jennings struck did not threaten, swing at, or move aggressively toward Jennings before Jennings hit him with the gun. Witnesses similarly testified that no one in the

group threatened Jennings or had any weapons out before Jennings struck the boy and discharged his gun.

Witnesses further testified that after his gun discharged, Jennings began pointing the gun at everyone in the group, at which point the victim pulled out a black gun, and Jennings fired multiple shots at the victim. According to testimony, although the victim tried squeezing the trigger of his gun, it was unloaded and thus did not discharge. Bullets fired from Jennings's gun hit the victim in the foot and back. Numerous witnesses testified that after the victim fell to the ground, Jennings "walked up to him, . . . put the gun to his neck[,]" and fired at least one more shot while "stand[ing] over him." Jennings then picked up the victim's black gun, walked back to his car with both guns, and drove away. One witness testified that after shooting the victim, Jennings stated, "Yeah, I killed him." The victim died from the gunshot wounds.

The following morning, Jennings turned himself in and gave police both guns. Testing indicated that the bullets recovered from the victim's body and the shells found in the area of the shooting were all fired from Jennings's purple gun.

Jennings spoke with police, and his interview was played for the jury. In addition, Jennings testified at trial. According to Jennings, when he confronted the

4

group during the first encounter about the football, they began cursing and arguing with him. They purportedly told Jennings they were "going to stomp [him] out." At that point, Jennings "flash[ed]" his gun, and more curse words were exchanged. Jennings denied threatening the group and testified that he fired the warning shot in the air because the group kept following and threatening him. Regarding the second incident, Jennings testified that when he returned to his house later that day, eight to ten individuals were on his porch, and the glass door to his house was open. Jennings retrieved his gun from the trunk of his car, carried it in plain view, and walked toward the group, yelling at them. According to Jennings, the group "ran up on [him]," and one of the boys from the first encounter told Jennings that he and the others were going to "stomp [him] out" and "beat [his] ass." Jennings testified that the same boy took a swing at him, and when Jennings reacted, the gun in his hand struck the boy in the head or face and discharged, even though he did not hit the boy "that hard." Jennings stated that after his gun discharged, he heard more gunshots, turned in the direction of the shots, saw the victim running toward him with a gun, got scared, and quickly fired at the victim. Jennings admitted firing a shot toward the ground after the victim fell down, claiming that he did so because the victim purportedly reached for

his weapon. Jennings denied shooting the victim while standing over him or pressing his gun to the victim's neck and firing a shot.

One of Jennings's nephews (who accompanied Jennings to the second encounter) testified that he did not know of the earlier encounter or why Jennings asked him to ride to the mobile home park. According to the nephew, one of the boys swung at Jennings, at which point Jennings hit the boy in the face with the gun, and the gun discharged. The nephew testified that when Jennings's gun went off, the victim started shooting at Jennings, and Jennings shot back. The nephew never saw Jennings stand over or press his gun to the victim's body and fire shots.

Based on the evidence, the jury found Jennings guilty of voluntary manslaughter, two counts of aggravated assault, and three counts of possession of a firearm during the commission of a felony. Jennings appeals from the denial of his motion for a new trial.

1. Jennings asserts that the evidence was insufficient to support his conviction for voluntary manslaughter because the testimony at trial showed that he acted in self-defense based on a reasonable fear of imminent violent injury. We disagree.

Under OCGA § 16-5-2 (a), "[a] person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" Specifically, "heated arguments, physical beatings, and fear of some danger present sufficient provocation for a voluntary manslaughter conviction." *Hamlette v. State*, 353 Ga. App. 640, 648 (4) (839 SE2d 161) (2020) (citation and punctuation omitted).

Georgia law, however, affords an immunity defense if the person acts in self-defense: "A person who uses threats or force in accordance with Code Section 16-3-21 [the self-defense statute] . . . shall be immune from criminal prosecution" unless the person uses a weapon that is unlawful for him to carry. OCGA § 16-3-24.2. In turn, OCGA § 16-3-21 (a) provides:

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23 [defense of habitation], a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force

7

is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

If a defendant claims his actions were justified because he acted in self-defense, the State must prove beyond a reasonable doubt that the defendant was not acting in self-defense. *Hipp v. State*, 293 Ga. 415, 418 (746 SE2d 95) (2013); see also *Gardhigh v. State*, 309 Ga. 153, 157 (2) (844 SE2d 821) (2020).

Jennings specifically argues that the evidence was insufficient to support his conviction for voluntary manslaughter because the State failed to prove that he did not act in self-defense. This Court recently considered the very argument raised by Jennings and noted:

> Circumstances which are sufficient to show voluntary manslaughter, as opposed to justifiable homicide, include a situation in which sudden passion, or fear, is aroused in the actor, without malice aforethought, and the actor willfully kills his attacker, when it was not necessary for him to do so in order to protect himself. Conduct cannot be justified as self-defense if the amount of force used by the person to defend himself or herself is excessive. Whether or not the evidence shows that a person had a reasonable belief that it was necessary to use deadly force to prevent death or great bodily injury to [himself] is a question for the jury. And the determination of a witness's credibility, including the defendant's testimony, is within the exclusive province of the jury.

8

*Aeger*, 356 Ga. App. at 671 (1) (citations and punctuation omitted). Indeed, as the Supreme Court of Georgia repeatedly has explained, issues of witness credibility and the existence of justification are for the jury to determine, and a jury "is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense." *Anthony v. State*, 298 Ga. 827, 829 (1) (785 SE2d 277) (2016); accord *Gardhigh*, 309 Ga. at 158 (3) (a jury is free to reject a defendant's claim that he acted in self-defense); *Roper v. State*, 281 Ga. 878, 880 (1) (644 SE2d 120) (2007) (witness credibility is for the jury to decide, as is the question of justification; therefore, a jury is free to reject a defendant's claim that he acted in self-defense).

Here, the facts, as detailed above and viewed in the light most favorable to the verdict, authorized the jury to conclude beyond a reasonable doubt that Jennings did not act in self-defense. Testimony demonstrated that (a) Jennings was the only individual to brandish and fire a weapon during the first heated encounter, (b) after leaving the neighborhood, Jennings left his children at his mother's house, returned with his nephews to the mobile home park, and confronted the group with a gun rather than call police, (c) none of the individuals at the mobile home park produced any weapons or moved aggressively toward Jennings until after Jennings struck one

9

of the boys and discharged his firearm, and (d) contrary to Jennings's claims that he heard gunshots and then shot at the victim, the testimony at trial and the physical evidence supported a finding that the victim never fired a shot.

At the very least, "[d]espite any evidentiary conflicts, the jury was free to disbelieve [Jennings's] claim of self-defense and to find that [he] was so influenced and excited that [he] reacted passionately rather than simply to defend [himself] when [he] shot and killed [the victim]." *Aeger*, 356 Ga. App. at 671 (1) (citation and punctuation omitted); accord *White v. State*, 312 Ga. App. 421, 424-425 (1) (b) (718 SE2d 335) (2011) (affirming jury's finding that defendant reacted passionately as required to support a voluntary manslaughter conviction when evidence showed that defendant engaged in heated argument with victim's brother, which victim joined, and argument escalated to preparations for mutual physical altercation). See also OCGA § 16-5-2 (a) (voluntary manslaughter is committed when a person shoots and kills a victim out of "a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person").

In addition, even if Jennings was authorized to use some force to defend himself after the victim drew a firearm, the evidence supported a finding that Jennings used excessive force. Witnesses testified that after the victim fell to the

10

ground, Jennings stood over him, put the gun to his neck, fired at least one more shot, and stated, "Yeah, I killed him." Accordingly, even if the jury accepted Jennings's version of events leading up to the shooting, the jury was authorized to conclude that Jennings used excessive force in continuing to shoot the victim after he had fallen to the ground. See *Jimmerson v. State*, 289 Ga. 364, 367 (1) (711 SE2d 660) (2011).

For the above reasons, the evidence was sufficient for a rational trier of fact to find that the State disproved Jennings's self-defense claim and established his guilt of voluntary manslaughter beyond a reasonable doubt. See *Gardhigh*, 309 Ga. at 158-159 (3). The trial court, therefore, did not err in denying Jennings's motion for a new trial on this ground.

2. Prior to trial, Jennings sought immunity from prosecution under OCGA § 16-3-24.2, claiming that his actions in connection with the charges at issue were in self-defense. The trial court denied his motion. Jennings asserts on appeal that the trial court erred in denying his pretrial motion for immunity because his actions were justified and the State did not present any witnesses to contradict Jennings's evidence at the immunity hearing. We disagree.

As stated in Division 1, OCGA § 16-3-21 (a) provides that a person is justified in using deadly force against another person when he reasonably believes that "such force is necessary to prevent death or serious bodily injury to himself." In turn, OCGA § 16-3-24.2 provides, in pertinent part, that a person who uses threats or force in accordance with OCGA § 16-3-21 shall be immune from criminal prosecution. However, OCGA § 16-3-21 (b) specifies that a person is not justified in using force under subsection (a) if he, among other things, "[w]as the aggressor" or "[i]nitially provoke[d] the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant."

"Unlike at trial, where the State must disprove a defendant's claim of self-defense beyond a reasonable doubt," in a pretrial immunity hearing "the defendant bears the burden to show that he is entitled to immunity from prosecution by a preponderance of the evidence." *Gardhigh*, 309 Ga. at 157 (2); accord *Hipp*, 293 Ga. at 417 ("Georgia's immunity statute bars criminal proceedings against persons if they present sufficient evidence at a pretrial hearing to persuade the trial court that they were acting in self-defense."). "When reviewing the denial of an immunity motion, [an appellate court] must view the evidence in the light most favorable to the trial court's ruling, and accept the trial court's findings of fact and credibility

12

determinations if there is any evidence to support them." *Gardhigh*, 309 Ga. at 157 (2) (citation and punctuation omitted).

Although the State presented only one witness at the immunity hearing in this case, and the trial court's ruling with respect to the pretrial motion for immunity must be based solely on the evidence presented at the pretrial hearing, see *Sifuentes v. State*, 293 Ga. 441, 444 (2), n. 3 (746 SE2d 127) (2013), the transcript from the hearing – viewed under the above standards – supports the trial court's conclusion that Jennings failed to demonstrate by a preponderance of the evidence that he acted in self-defense. For example, 32-year-old Jennings admitted that during the first encounter he confronted a group of children and young adults while carrying a weapon, that none of the individuals had any weapons, and that he fired his weapon in the air when he returned to his yard. Jennings then left the neighborhood, took his children to his mother's house, and returned to the mobile home park with his two nephews, who were going to "watch [his] back." Jennings parked some distance away from his house, retrieved his firearm from the trunk, and once again confronted individuals who were on or near his yard with the gun in his hand. Jennings testified that he did not know why he did not call the police, and both Jennings and his

nephews testified that they did not see anyone with guns, knives, or any weapon prior to the discharge of Jennings's weapon.

Regarding the shooting of the victim, Jennings testified that he heard shots, turned toward the shots, saw the victim holding a gun, and shot the victim. However, an officer with the Gwinnett County Police Department testified at the immunity hearing that police recovered three shell casings from the scene, and all three came from the same gun – Jennings's gun – thereby undermining Jennings's testimony that the victim shot at him first. Jennings admitted that after shooting the victim, he picked up the victim's gun and drove to his mother's house.

This testimony – viewed in the light most favorable to the trial court's ruling – supported a finding that Jennings was the aggressor and that he intended to use deadly force before he returned to the neighborhood brandishing his weapon and before any physical threat was made against him. See *Hornbuckle v. State*, 300 Ga. 750, 753 (2) (797 SE2d 113) (2017) (trial court's denial of pretrial motion for immunity was affirmed where there was some evidence that the defendant's actions were motivated by anger or aggression rather than self-defense); *Sifuentes*, 293 Ga. at 445 (2) (trial court's denial of pretrial motion for immunity was affirmed where

evidence showed the shooting was motivated by gang rivalry and a desire for revenge, rather than self-defense); *Thompson v. State*, 327 Ga. App. 893, 895 (1) (761 SE2d 413) (2014) (trial court's denial of pretrial motion for immunity was affirmed where evidence showed that the defendant intended to use deadly force before the victims arrived at the scene, brandished a weapon before any physical threat was made toward him, and continued to use an unnecessary level of force). As either "the aggressor" or the person who "[i]nitially provoke[d] the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant," Jennings was not entitled to claim self-defense. OCGA § 16-3-21 (b).

Because the trial court's decision was supported by the evidence, we conclude that the trial court was authorized to find that Jennings failed to meet his burden of showing that he was entitled to immunity.

*Judgment affirmed. Rickman, C. J., and McFadden, P. J., concur.*